UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NULANKEYUTMONEN NKIHTAQMIKON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV-05-188-B-W |
| v. | ) | |
| | ) | |
| BUREAU OF INDIAN AFFAIRS, DEPARTMENT OF THE INTERIOR | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Nulankeyutmonen Nkihtaqmikon[1] (NN), a group of private citizens who are members of the Passamaquoddy Tribe (Tribe), brought this Freedom of Information Act (FOIA) action against the Bureau of Indian Affairs (BIA) seeking documents related to the BIA's approval of a ground lease agreement between the Tribe and Quoddy, LLC, a private liquefied natural gas (LNG) company hoping to build a terminal on tribal lands.  NN's First Amended Complaint seeks declaratory and injunctive relief grounded in three charges: (1) that the BIA failed to conduct an adequate search to respond to NN's requests for records; (2) that the BIA wrongfully withheld documents; and, (3) that the BIA engaged in an impermissible practice of "delayed disclosure" which has caused injury – and will cause future injury – to NN.  The parties have filed cross motions for summary judgment.  *See Defs.' Am. Mot. for Summ. J.* (Docket # 59) (*Defs.' Mot.*); *Pl.'s Cross-Mot. for Summ. J.* (Docket # 55) (*Pl.'s Mot.*).[2]  The Court denies NN's motion and grants the BIA's motion.

---

[1] According to NN's Complaint in a companion action, Nulankeyutmonen Nkihtaqmikon means "We Protect the Homeland."  *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 462 F. Supp. 2d 86, 89 n.1 (D. Me. 2006).
[2] On May 31, 2007, the BIA filed a supplemental memorandum following the oral argument to answer the Court's question as to whether the BIA reached a final decision about the Tribe's waiver of an appraisal.  *See Defs.' Post-*

## I.       STATEMENT OF FACTS

### A.       NN's First FOIA Request – June 8, 2005

The facts are largely undisputed.[3]  On June 1, 2005, the BIA approved a ground lease agreement between the Tribe and Quoddy, LLC, which planned to construct an LNG facility on tribal land.  The citizens who comprise NN are residents of the Pleasant Point Passamaquoddy Reservation and oppose its construction on tribal lands.  NN faxed its first FOIA request to Suzanne Langan of the BIA on June 8, 2005, asking for documents related to the proposed lease of tribal land to Quoddy, LLC.  The first request sought:

> 1.  All documents in your possession and control concerning the proposed construction of a LNG facility by the group "Quoddy, LLC" in or around the Passamaquoddy Bay, Point Pleasant, Fundy Bay, Gleason Point, or Gleason Cove.
>
> 2.  All documents concerning the proposed lease of tribal land by the Passamaquoddy Reservation at Point Pleasant to Quoddy, LLC.
>
> This request includes, but is not limited to, reports, survey data, inter and intra-agency correspondence (both written and electronic), agency correspondence with the tribe and/or its members and with Quoddy, LLC (both written and electronic), maps, photographs, environmental studies, charts and graphs, and records of relevant phone calls, minutes of relevant meetings, and any other related documents.

On June 9, 2005, a representative for NN followed up by telephone with Ms. Langan, who informed her that the only document responsive was the ground lease itself.  NN already possessed the lease.

---

*Argument Mem.* (Docket # 71).  NN responded with a memorandum.  *See Pl.'s Resp. to Defs.' Post-Argument Mem.* (Docket # 72).  Although the Court views NN's filing as a response, not an objection, to the extent it may be construed as an objection, the Court overrules it.
[3]  On September 25, 2006, the Court issued two Orders on the Plaintiff's request for the Solicitor's Opinion. *Nulankeyutmen Nkihtaqmikon v. Bureau of Indians Affairs*, 453 F. Supp. 2d 193 (D. Me. 2006); *Nulankeyutmen Nkihtaqmikon v. Bureau of Indians Affairs*, 450 F. Supp. 2d 113 (D. Me. 2006).  The Court's Order on a separate action in which the Plaintiff sought declaratory and injunctive relief provides further context.  *See Nulankeyutmen Nkihtaqmikon v. Impson*, 462 F. Supp. 2d at 89.

**B.      NN's Second FOIA Request – July 11, 2005**

On July 11, 2005, NN filed a second FOIA request with the BIA, with different language

to reflect that the issue no longer involved a "proposal," because in the meantime, NN learned

that the BIA had approved the lease agreement on June 1, 2005.[4]  In that letter, NN made a more

detailed request:

> 1.  The environmental review documents, prepared either by BIA
>     or the Sipayik Environmental Department, and any other
>     environmental documents relied upon.
>
> 2.  The Solicitor's Opinion regarding the decision to approve the
>     lease.
>
> 3.  Information regarding any appeal process that may be available
>     for this decision through the BIA or the Department of Interior.
>
> 4.  All documents in your possession and control concerning the
>     decision of BIA to approve the ground lease between
>     Passamaquoddy Reservation and Quoddy, LLC.
>
> This request includes, but is not limited to, reports, survey data,
> inter and intra-agency correspondence (both written and
> electronic), agency correspondence with the tribe and/or its
> members and with Quoddy, LLC (both written and electronic),
> maps, photographs, environmental studies, charts and graphs, and
> records of relevant phone calls, minutes of relevant meetings, and
> any other related documents.

**C.      The BIA's Response – August 5, 2005**

The BIA responded by letter dated August 5, 2005,[5]  identifying and enclosing one

document responsive to NN's first item – a categorical exclusion checklist.  With regard to the

---

[4] The parties dispute whether this second request was meant to supersede NN's first request.  The BIA treated it as superseding, *Defs.' Statement of Material Facts* ¶ 8 (Docket # 12) (DSMF), and did not formally respond to the first request, but NN maintains that the "information sought in the June 9, 2005 request remained relevant and should have been considered by the BIA when responding to the July 11, 2005 request."  *Pl.'s Statement of Material Facts* ¶ 8 (Docket # 15) (PSMF).  The Court concludes below that the BIA acted reasonably in construing the second request to supersede the first.

[5] The delay between the July 11 request and the August 5 response was compliant with the BIA's regulations relating to the timing of a response to a FOIA request.  *See* 25 C.F.R. § 2.12 (providing 20 workdays for the Bureau to respond to a request).

second item, the BIA informed NN that it was withholding the Solicitor's Opinion pursuant to the FOIA exemption provided by 5 U.S.C. § 552(b)(5) (Exemption 5). The BIA claimed that the document "reflects the recommendations and advice of staff members, and was used to arrive at a final agency decision." For the third item, the BIA responded that it is "not required under FOIA to fulfill an 'information' request." Finally, the BIA concluded that the only document responsive to the fourth item was the ground lease itself. The BIA did not respond to the request contained in the unnumbered paragraph, which broadly defined the sorts of documents NN was seeking.

### D.     NN's Appeal of September 1, 2005 and DOI's Ruling

On September 1, 2005, NN appealed the BIA's decision to the Department of Interior (DOI), raising three main arguments. First, with respect to the BIA's refusal to disclose the Solicitor's Opinion, NN argued that Exemption 5 was inapplicable because "regardless of any intra-agency category, it was used as the basis for the BIA's final decision to approve the lease." Second, NN asserted the BIA was required under FOIA to "make reasonable efforts" to comply with its request for information regarding any appeal process available to NN. Third, with respect to the unnumbered paragraph, NN claimed that the BIA's response to its request did not "take into account the scope of the request."

DOI partially granted the appeal on October 6, 2005, but it failed to reach a decision about the applicability of Exemption 5.[6] As to the other grounds for appeal, DOI required NN to

---

[6] The BIA responded:

> Regrettably, the Department is not able to reach a determination on the fifth issue in the appeal within the time limits set in the FOIA because of an extraordinarily large number of appeals pending in the Department ahead of yours, the need to fully review the issues you presented in your appeal on this matter, and other unforeseen circumstances. Therefore, you may seek judicial review under 5 U.S.C. § 552(a)(4)(B). However, we hope that you will delay filing a lawsuit so that the Department can thoroughly review this matter and

"describe the requested records in enough detail to enable the employee familiar with the subject area of the request to locate the records with a reasonable amount of effort," and directed the BIA to determine whether it could locate the records with a "reasonable amount of effort."  With regard to the third issue, because the BIA did not address NN's request in the unnumbered paragraph, the DOI remanded the issue to the BIA for reconsideration of that aspect of the request.   DOI denied NN's appeal with respect to its request for "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply," because FOIA does not require an agency to create documents that do not exist.[7]  DOI also agreed with NN that the BIA had failed to identify the amount of information contained within the Solicitor's Opinion, and remanded the case to the BIA.

### E.   Remand to the BIA

On remand, the BIA conducted a broader, supplemental search for documents over a three-week period and reported its findings to NN in a letter dated October 25, 2005.  The BIA informed NN of the existence of two additional documents – agency correspondence with the Tribe – both of which the BIA redacted pursuant to FOIA Exemption 4.  The BIA letter further informed NN that the Solicitor's Opinion, still withheld, was three pages long, and attached a copy of 25 C.F.R. § 162.113, which outlines the BIA's appeal process.

---

make a determination.  We appreciate your patience and the Department will make every effort to reach a decision on the second issue in the appeal as soon as possible.

[7] DOI pointed out that NN was requesting a "Vaughn index," *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), in which the agency correlates the withheld document with a specific FOIA exemption.  The purpose of a Vaughn index is to allow the court to "effectively and efficiently" consider the factual nature of the disputed information. *Id.* at 826.

**F.     NN Files Suit**

Still dissatisfied, NN filed suit in federal court on December 6, 2005, requesting release of the Solicitor's Opinion.[8]  Four months later, on April 6, 2006, the BIA voluntarily produced a full, unredacted version of the Solicitor's Opinion and on May 25, 2006, the BIA moved for summary judgment on mootness grounds, arguing that there no longer existed a case or controversy because NN now possessed the subject of the Complaint.  Recognizing that NN had limited its cause of action to the Solicitor's Opinion because of the BIA's representation that that was the only document responsive to its FOIA request, the Court granted the BIA's motion, but allowed NN to amend its Complaint.  *See Nulankeyutmonen Nkihtaqmikon*, 450 F. Supp. 2d at 115; 453 F. Supp. 2d at 204.

**G.     NN's Third FOIA Request – May 12, 2006**

When NN received the Solicitor's Opinion, it found references to documents that appeared responsive to NN's FOIA request, but that the BIA itself had not yet disclosed.  On May 12, 2006, NN sent a new FOIA request for these documents:

1.  The letter sent to the BIA from the Tribe's expert in the field of natural gas plants, describing advice to the Tribe concerning the reasonableness of the lease agreement, as referenced in the Solicitor's Memorandum prepared by Horace G. Clark, dated May 26, 2005.
2.  All documents relating to the above letter.
3.  All documents in your possession and control relating to the Tribe's decision to approve the lease agreement and all documents relating to the Tribe's decision to waive an appraisal by the BIA.
4.  All documents relating to the BIA's decision to approve the lease agreement, all documents relating to the BIA's decision to forego environmental analysis under NEPA, and all documents relating to the BIA's decision not to conduct an appraisal of fair annual rental for the leased land, including, but not limited to, the Memorandum of March 18, 2003, "Appraisal of Fair Annual Rental – Eastern Band of Cherokee Indians," as referenced in the Solicitor's Memorandum of May 26, 2005.

---

[8] After NN filed suit, the DOI closed the appeal.

6

This request includes, but is not limited to, reports, survey data, inter and intra-agency correspondence (both written and electronic), agency correspondence with the tribe and/or its members and with Quoddy Bay, LLC (both written and electronic), maps, photographs, environmental studies, charts and graphs, and records of relevant phone calls, minutes of relevant meetings, and any other related documents.

**H.**     **The BIA Responds to the Third FOIA Request**

On June 8, 2006, the BIA responded to NN's third FOIA request by releasing two additional documents: (1) the tribal resolution authorizing the Quoddy lease; and, (2) a categorical exclusion checklist.  The BIA also identified eleven withheld documents, citing FOIA exemptions.  Included was the letter the Tribe's natural gas expert sent the BIA.  The BIA claimed the letter was protected from disclosure under FOIA Exemption 4, as "trade secrets and commercial or financial information obtained from a person that is privileged or confidential."  The BIA identified and withheld nine documents responsive to NN's fourth numbered request, citing FOIA Exemption 5 because "they reflect the personal opinions, recommendations, and advice of staff members, and were used to arrive at a final agency decision."  In addition, the BIA identified a 25-page draft environmental study, which it also withheld under Exemption 5.

**I.**      **NN's Provisional Appeal and DOI Response**

In light of these revelations, NN filed a notice of provisional appeal of the BIA's June 8 response.  On September 14, 2006, DOI responded, addressing a total of 20 disputed documents.  First, it released 14 documents in part or in full.  Next, DOI corrected the BIA's response, noting that the BIA actually withheld 19 documents under Exemption 5, not ten documents as the BIA had indicated.  Addressing the propriety of the BIA's use of Exemption 4 to withhold the letter from the Tribe's expert, DOI noted that, while the Tribe orally objected to the disclosure of the

document, the BIA regulations require the Tribe to file a "detailed written statement." Without such a statement in the record, DOI was unable to rule on the applicability of Exemption 4.

DOI then turned to the applicability of Exemption 5, for "inter-agency or intra-agency memorandums or letters," to two documents created by the Tribe: tribal correspondence and a 25-page draft environmental study. Because the Tribe was not a consultant working on behalf of DOI at the time of the communications, Exemption 5 did not justify withholding of these documents. However, consistent with its regulations, DOI again offered the Tribe an opportunity to provide alternative grounds for withholding the documents through a detailed written statement. *See* 43 C.F.R. § 2.23(e). DOI applied the same analysis to two pages of documents created by Quoddy, LLC, giving it an opportunity to object to the disclosure.[9]

As for the other 17 documents the BIA withheld, DOI concluded that Exemption 5 applied as "inter-agency or intra-agency communications" subject to privilege. For 13 of the 17 documents, the DOI concluded that the deliberative privilege applied because they were created before the BIA made its decision as to the approval of the lease. However, because some of the information in 11 of the 13 documents was factual in nature, DOI ordered redactions when released to NN. The other two documents contained no factual material, and DOI ordered them withheld in their entirety.

In addition, DOI invoked the attorney-client privilege for certain documents, to the extent that four documents contain "confidential communications from Departmental employees to or from attorneys in the Office of the Solicitor related to legal matters for which they sought professional legal services and the documents encompass opinions given by the attorneys to their clients based on client-supplied facts." Finally, DOI invoked FOIA Exemption 6 ("personnel

---

[9] Neither the Tribe nor Quoddy Bay submitted any objection to the disclosure of these documents, so DOI released them in their entirety to NN by letter dated September 21, 2006.

and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"), and redacted personal, non-governmental email addresses from the disclosed documents.

In sum, DOI concluded that two documents contained no protected information – a three-page memo regarding an inter-agency meeting and an eight-page inter-agency correspondence regarding the lease – and attached them to its letter to NN.  With respect to the remaining documents, two did not "contain any factual information that can be segregated" and were withheld in their entirety.  Finally, the DOI released eleven redacted documents.

## II.     STANDARDS

### A.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if it has the "'potential to affect the outcome of the suit under the applicable law.'"  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)).  For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the nonmoving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  Rather, "[t]he evidence illustrating the factual controversy . . .

must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . ."  *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st. Cir. 1989) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975)).

When there are cross motions for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004).  "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2720).

## B.      FOIA Standard

"The FOIA was intended to expose the operations of federal agencies 'to the light of public scrutiny.'"  *Carpenter v. United States Dep't of Justice*, 470 F.3d 434, 437 (1st Cir. 2006) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976)).  FOIA directs federal agencies to provide public access to their records, unless the materials fall into one of the exemptions in the Act.  *See* 5 U.S.C. § 552(a)(3).  "The government bears the burden of demonstrating the applicability of a claimed exemption . . . and the district court must determine *de novo* whether the queried agency has met this burden . . . ."  *Church of Scientology Int'l v. United States Dep't of Justice*, 30 F.3d 224, 228 (1st Cir. 1994) (citations omitted).  "The nine FOIA exemptions are to be construed narrowly, with any doubts resolved in favor of disclosure."  *Carpenter*, 470 F.3d at 438.  While the FOIA request must reasonably describe the records

sought, the "agency also has a duty to construe a FOIA request liberally." *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).

The Court makes "*de novo* determinations as to the validity of the asserted exemptions." *Id*. The standard is as follows:

> To determine whether a court should grant summary judgment under the FOIA, the court must see if the undisputed material facts, as shown by exhibits, affidavits, and/or the Vaughn index, show (1) that the agency conducted a reasonable search for responsive records, and (2) that each document has been produced, is identifiable, or is exempt from disclosure. . . . Therefore, the defendant agency has the burden of justifying the withholding of requested documents and demonstrating that it conducted a reasonable search for the requested information.

*Wilderness Soc'y v. United States Dep't of Interior*, 344 F. Supp. 2d 1, 10 (D.D.C. 2004) (citations omitted).

## III.    DISCUSSION

### A.    Wrongful Withholding of Documents

To assist the court, it is common practice for the agency to provide a so-called "Vaughn index," named after the seminal case *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).  A Vaughn index "requires a correlation of the information that an agency decides to withhold with the particular FOIA exemption and the agency's justification for withholding." *Maine v. United States Dep't of Interior*, 298 F.3d 60, 65 (1st Cir. 2002).

On November 22, 2006, the BIA provided the Court with a Vaughn index, outlining the documents responsive to NN's FOIA requests and the status of each document (released in full, redacted, or withheld).  For the redacted or withheld documents, the BIA has set forth the exemptions it contends justify the withholding.  The BIA has identified twenty documents responsive to NN's FOIA request of May 12, 2006.  Four documents – 1, 6, 13, and 15 – have

been released in their entirety.  With respect to the remaining sixteen, the BIA has either withheld them or released a redacted version.  In its Vaughn index, the BIA has broken the twenty documents into five categories.

### 1.    Exemption 5

FOIA Exemption 5 is contained in 5 U.S.C. § 552(b)(5), and provides that an agency need not provide public access to 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Incorporated within FOIA Exemption 5 are certain "civil discovery privileges," including the deliberative process privilege and the attorney-client privilege.  *See United States Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).

### 2.    Deliberative Process Privilege

The BIA has claimed the deliberative process privilege with respect to sixteen withheld or redacted records.  The purpose of the deliberative process privilege is to "shield from public disclosure confidential inter-agency memoranda on matters of law or policy."  *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995) (citation omitted).  As its name suggests, the privilege is designed to protect not only deliberative material, but also the quality of the deliberative process and agency decisions.  *See Judicial Watch*, 449 F.3d at 151; *Horowitz v. Peace Corps*, 428 F.3d 271, 276 (D.C. Cir. 2005).  In so doing, the privilege "encourages frank and open discussions of ideas, and, hence, improves the decisionmaking process."  *National Wildlife Fed'n v. United States Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988); *see also Judicial Watch*, 449 F.3d at 151 ("[T]he quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl because the full and frank

12

exchange of ideas on legal or policy matters would be impossible.") (citation and internal quotation marks omitted); *Carter v. United States Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002) ("The purpose of this privilege is to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny.").  Indeed, as the Supreme Court has noted, "[i]t would be impossible to have any frank discussions of legal or policy matters in writing if all such writings were to be subjected to public scrutiny."  *EPA v. Mink*, 410 U.S. 73, 87 (1972).

The First Circuit has identified three ways the privilege performs this safeguarding function:

> It serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Providence Journal Co. v. United States Dep't of Army*, 981 F.2d 552, 557 (1st Cir. 1992) (citation omitted).  However, "[b]ecause the deliberative process privilege is restricted to the intra-governmental exchange of thoughts that actively contribute to the agency's decisionmaking process, factual statements or post-decisional documents explaining or justifying a decision already made are not shielded."  *Texaco*, 60 F.3d at 884-885.

To qualify for the deliberative process privilege, "a document must be (1) predecisional, that is, 'antecedent to the adoption of agency policy,' and (2) deliberative, that is, actually 'related to the process by which policies are formulated.'"  *Texaco*, 60 F.3d at 884 (quoting *National Wildlife Fed'n v. United States Forest Serv.*, 861 F.2d at 1117); *see also Judicial*

*Watch*, 449 F.3d at 151 ("The deliberative process privilege protects agency documents that are both predecisional and deliberative.").  To show that the document is predecisional, the agency must "(i) pinpoint the specific agency decision to which the document correlates . . . (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision . . . and (iii) verify that the document  precedes, in temporal sequence, the decision to which it relates."  *Providence Journal*, 981 F.2d at  557 (internal citations and quotation marks omitted).  "A predecisional document will qualify as 'deliberative' provided it (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency."  *Id.* at 559.  Finally, "[a]n agency may withhold non-exempt information only if it is so interspersed with exempt material that separation by the agency, and policing of this by  the courts would impose an inordinate burden."  *Church of Scientology*, 30 F.3d at 228 (citation and internal quotation marks omitted).

NN claims that a number of the documents "do not identify a specific, final agency decision . . . ."  Further, NN has clarified that it views "June 1, 2005 [as] the critical date for <u>all</u> Category I documents."  *Pl.'s Resp. to Defs.' Post-Argument Mem.* at 1 (Docket # 72) (emphasis in original).  NN contends that June 1, 2005 was the date the BIA waived the land appraisal, approved the ground lease, concluded that it would be a Cooperating Agency for the environmental impact statement (EIS) development through the Federal Energy Regulatory Commission (FERC), decided to conduct its own environmental review of the lease, and reached decisions regarding litigation strategy.  *Id.* at 2-3.  If June 1, 2005 is the "critical date," many documents could not be pre-decisional, because they post-date June 1.

The BIA's response on this issue is two-fold. First, it acknowledges that as regards at least one decision – the decision to waive the appraisal – the critical decision date was June 1, 2005. *Defs.' Post-Argument Mem.* at 2 (Docket # 71). However, as regards other issues, including the approval of the ground lease, the BIA contends the documents relate to the ongoing decisional process required for FERC approval and points to the contingent nature of its June 1, 2005 action. *Id.* at 2-3.

Here, the question is how FOIA addresses a multi-step approval process, which contemplates periodic preliminary steps during a multi-phase approval process, leading to a final decision. To require disclosure of the agency deliberative process before a final decision could affect the quality of the final decision; yet, to require disclosure only upon the final decision would leave the public unaware of information critical to the agency's preliminary judgments. Although not precisely addressing this issue, the Supreme Court has written:

> Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 n.18 (1975).

In either case, the Court's proper judgment must be grounded on the content of the contested document compared with the nature of the decision. For example, where, as here, the BIA has made a final decision during an interim step – as where it elected to allow the Tribe not to obtain an appraisal, FOIA mandates disclosure. But, if the BIA's document only reveals discussion about the overall approval process, the document remains predecisional and not

subject to FOIA disclosure.  In this case, where the lines are blurred between deliberation on the overall process and decisionmaking on interim steps, FOIA favors disclosure.

**a.      Category 1: Internal Communications - Emails, Faxes, and Other Written Memoranda**

The BIA has divided the documents into a number of categories.  Within this first category, the BIA asserts the deliberative process privilege with respect to Vaughn # 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 16, 18, and 19.  Nearly all these records are email messages, chains of email conversations, or faxes between members of DOI, the BIA, and/or the National Park Service. Vaughn # 2 and 16 predate the June 1, 2005 decision; Vaughn # 18 and 19 are undated; Vaughn # 3, 4, 5, 7, 9, 10, 11, and 12 postdate the June 1, 2005 decision.[10]

NN argues that "Vaughn #3 through #12 are simply employee email summaries of conference calls, meetings, and various 'issues' relating to different options or approaches in regards to LNG projects, the FERC licensing process, or the BIA's 'future deliberations related to the lease.'"[11]  *Pl.'s Mot.* at 17. Further, extrapolating from the unredacted portions of Vaughn # 7, 11, and 12, NN asserts that these three documents are postdecisional.  *Id.* at 17-18.  Having the benefit of the context of each full email, however, it is clear these documents are not postdecisional, as they involve impressions about the progress of the LNG issue generally.[12]

With respect to the deliberative nature of the documents, NN claims that "none of the documents . . . qualify because they do not relate to the formulation of the BIA's policy or law. .

---

[10] This list somewhat overstates the controversy, since Vaughn # 3, 16, and 19 are separately exempt from disclosure under the attorney-client privilege, and Vaughn # 19 is also exempt under the exemption for mental impressions.

[11] Vaughn # 3 is a useful example.  The redacted portion names the persons who will be invited to participate in future conference calls and refers to (but does not enclose) a summary of an April 20, 2006 conference call.  But, the fax is addressed to John Harrington, an employee within the Office of the Solicitor for the BIA, and the unredacted portion of Vaughn # 3 confirms that the document summarized facts about which Mr. Kardatzke was seeking legal advice from Attorney Harrington.

[12] These three documents are actually one and the same:  an April 27, 2006 email from James Kardatzke to several BIA officials.  The unredacted text reads:  "What appears to be the final result was completed by a solicitor/OEPC conference call on May 27th that Richard Fields (SOL-Atlanta) summed up to me."

16

. . Rather, the withheld documents . . . are more akin to the BIA's administrative housekeeping." *Pl.'s Mot*. at 19.   After reviewing the documents in camera, the Court concludes that NN's characterization of these documents is incorrect.[13]   The withheld documents are exactly the type of documents – email chains among BIA officials, and between the BIA and other agencies – that the deliberative process privilege contemplates must be protected from disclosure in order to promote open and candid discussion during the decisionmaking process.   Contrary to NN's contention, to deny public access to these documents will not result in "secret law." *See id*. (quoting *Sears*, 421 U.S. at 152-53; *Coastal States Gas Corp.*, 617 F.2d at 867).   Rather, it will prevent the "chilling effect" on intra-agency discussion courts have cautioned against and will enhance the quality of agency deliberations and the ultimate decision.   *See American Fed'n of Government Employees (AFGE)* v. *United States Dep't of Health and Human Servs.*, 63 F. Supp. 2d 104, 108 (D. Mass. 1999).

NN makes another argument with respect to Vaughn # 5, claiming it is not an inter- or intra-agency communication.   *Pl.'s Mot*. at 19-20.   That document is an email sent by Kevin Mendik, National Park Service Hydro Program Manager, to various National Park Service employees and to an individual associated with the Roosevelt Campobello International Park Commission (RCIPC).[14]   The RCIPC individual was apparently included because the email briefly addresses the impact of an LNG terminal on United States President Franklin D. Roosevelt's Cottage, which is located in the International Park in an area that may be affected by

---

[13] The Court is not critical of NN for making the argument.  On this point as in others, NN is necessarily shadow boxing.  In the unusual context of these motions, the BIA and the Court have access to the unredacted and withheld versions of the disputed documents, but NN does not.  The Court understands that NN is making the best argument it can within the limitations of its knowledge.

[14] The six-member commission consists of three American members (appointed by the President) and three Canadian members, and serves to "administer as a memorial the Roosevelt Campobello International Park comprising the Roosevelt estate and such other lands as may be acquired."  16 U.S.C. § 1102, 1104.

the LNG terminal.  NN argues that the RCIPC is a third-party, and not a government agency; thus, the BIA has waived Exemption 5.  *Pl.'s Mot*. at 20.

Courts have "employed a functional rather than a literal test in assessing whether memoranda are "inter-agency or intra-agency." *Durns v. Bureau of Prisons*, 804 F.2d 701, 705 n.4 (D.C. Cir. 1986) (citing *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980)).  *Ryan* acknowledges:

> In the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees. Such consultations are an integral part of its deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions.

617 F.2d at 789-90.   *Ryan* favors a "common sense interpretation of 'intra-agency' to accommodate the realities of the typical agency deliberative process . . . ." *Id.* at 790.

The First Circuit discussed the distinction in *County of Madison v. United States Dep't of Justice*, 641 F.2d 1036 (1st Cir. 1981).  In *County of Madison*, the FOIA request was for documents relating to a proposed settlement between the Department of Justice (DOJ) and the Oneida Indians, the latter clearly not being a government agency.   Although the DOJ made compelling policy arguments in favor of the non-disclosure of proposed settlement documents, the First Circuit, emphasizing that FOIA is "not a withholding statute but a disclosure statute," rejected the DOJ arguments as not being "grounded in a reading of statutory language."  *Id.* at 1040 (internal punctuation and citations omitted).  At the same time, *County of Madison* noted that the *Ryan* logic goes "beyond the simplest measure of who is 'within' an agency" and leaves "literalness behind."  *Id.   County of Madison* commented that the precept that "forms the object of exemption five" is that the agency should be able to base its decision on undisclosed "advice

from staff assistants and [an] exchange of ideas among agency personnel." *Id.* (internal punctuation and citation omitted).

With these principles in mind, even though it is unclear whether the RCIPC fits the exact statutory definition of "agency,"[15] the Court concludes that it is the functional equivalent of an agency in this context. The RCIPC is an international hybrid with three of its members appointed by the President, and it makes common sense for the National Park Service, as part of the Department of the Interior, to include it in emails. Further, even though Mr. Mendik was not expressly asking the RCIPC for information or advice, its inclusion was presumably not merely to inform the RCIPC, but to anticipate that the RCIPC would respond, if appropriate, with advice or insight helpful to the BIA's decisionmaking process. Exemption 5 shields this deliberative process from "public view."

The Court concludes that the documents in Category I are predecisional and deliberative, and, therefore, are subject to exemption under 5 U.S.C. § 552(b)(5). In addition, because the

---

[15] The FOIA defines "agency:"

> For the purpose of this subchapter [5 U.S.C. §§ 551 et seq.]--
>   (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--
>     (A) the Congress;
>     (B) the courts of the United States;
>     (C) the governments of the territories or possessions of the United States;
>     (D) the government of the District of Columbia;
>   or except as to the requirements of section 552 of this title [5 U.S.C. § 552]--
>     (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
>     (F) courts martial and military commissions;
>     (G) military authority exercised in the field in time of war or in occupied territory; or
>     (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41 [41 U.S.C. §§ 101 et seq.]; subchapter II of chapter 471 of title 49 [49 U.S.C. §§ 47151 et seq.]; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix . . . .

5 U.S.C. § 551; *see Ellsworth Bottling Co. v. United States*, 408 F. Supp. 280, 282 (W.D. Okla. 1975) ("The test for determining whether an arm of the Government has sufficient authority to justify classifying it as an agency under the APA is whether the arm has the authority to act with the sanction of the Government behind it.").

factual information in those documents is "interspersed with exempt material," the BIA is not required to further redact the documents.

>   **b.     Category 2: Mental Impressions - Handwritten Notes**

One category of documents usually included in the deliberative process privilege is a government official's handwritten notes.  The reason for this exemption is that "[n]otes generally are selective and deliberative – and routine public disclosure of meeting notes and other notes would hinder government officials from debating issues internally, deter them from giving candid advice, and lower the overall quality of the government decisionmaking process."  *Baker & Hostetler LLP v. United States Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006).  In its Vaughn index, the BIA asserted the deliberative process privilege with respect to three documents that contain handwritten notes.  Vaughn # 14, which was withheld in full, is a couple of pages of handwritten notes taken by Jim Kardatzke.[16]  In Vaughn # 17, the BIA redacted from the environmental assessment of the ground lease agreement certain margin notes, which clearly evince the mental impressions of the person taking the notes.  The BIA lists Vaughn # 19 as the other document containing handwritten notes; this document, however, is merely a fax from John Harrington to Kurt Chandler and contains no handwritten notes.[17]  The Court concludes that Vaughn # 14 and 17 fall within the deliberative process exemption; however, the Court also concludes, as the BIA concedes, that Vaughn # 19 does not.

>   **c.     Category 3: Draft Documents - Draft Environmental Document**

Citing the deliberative process privilege, the BIA withheld Vaughn # 20, a draft environmental document.  Although not included in the language of 5 U.S.C. § 552(b)(5), courts

---

[16] From the portions of Mr. Kardatzke's handwriting that the Court could decipher, Vaughn # 14 contains deliberative material.

[17] At oral argument, the BIA conceded that Vaughn # 19 contained no handwriting and is not subject to non-disclosure on this basis.

have generally considered drafts of predecisional documents to fall under Exemption 5.  *See, e.g.*, *National Wildlife Fed'n,* 861 F.2d at 1122; *AFGE,* 63 F. Supp. 2d at 108.  The rationales for this policy include: (1) that "releasing the draft would enable a careful reader to determine the substance of [the agency's] proposed and adopted changes," essentially divining the agency's decision-making process; and (2) disclosure of drafts could have a "chilling effect" on agency employees and inhibit "candid discussion within the agency;" and (3) releasing drafts "could cause harm by providing the public with erroneous information . . . ."  *AFGE*, 63 F. Supp. 2d at 108.

According to the BIA, "a BIA employee created the draft document as the BIA contemplated . . . how the agency would comply with the National Environmental Policy Act." *Defs.' Mot*. at 11.  While the BIA did not disclose this draft to NN, it did provide the final version of the document.  Because it is both predecisional and deliberative, the Court concludes that the BIA properly withheld Vaughn # 20.

### 3.    Category 4:  Attorney-Client Privilege

The attorney-client privilege "protects confidential communications made by a client to his attorney."  *Maine v. United States Dep't of Interior*, 298 F.3d 60, 70 (1st Cir. 2002).  The First Circuit explained:

> The privilege also protects from disclosure documents provided by an attorney if the party asserting the privilege shows: (1) that he was or sought to be a client of [the attorney]; (2) that [the attorney] in connection with the [document] acted as a lawyer; (3) that the [document] relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in legal proceedings; and (4) that the privilege has not been waived.

*Id*. at 71.  The underlying rationale for the privilege is to promote "full disclosure by clients to their attorneys" and to allow attorneys "to act more effectively, justly, and expeditiously."  *Id*.

Here, the BIA has invoked the privilege with respect to Vaughn # 3, 16, 19, and 20.  In its brief, NN has not argued that the attorney-client privilege does not apply to these documents. All four documents involve communications between the BIA and the Solicitor's Office – either opinions conveyed from the Solicitor's Office, or requests for opinions from BIA employees. Therefore, the Court concludes that these four documents are  protected by the attorney-client privilege.

### 4.        Exemption 6 – Personal Privacy: personal email addresses

Under 5 U.S.C. § 552(b)(6) (Exemption 6), an agency may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  The BIA invoked Exemption 6 with reference to one document, Vaughn # 3, redacting the personal (non-governmental) email addresses of certain people involved in the email chain; NN does not challenge the propriety of the application of this exemption.  Because the disclosure of personal email addresses is a "clearly unwarranted invasion of personal privacy," the Court concludes that the BIA properly applied Exemption 6 to redact personal email addresses from Vaughn # 3.

### 5.        Summary

The BIA has released the following documents unredacted:  Vaughn # 1, 6, 13, and 15. The BIA correctly asserted Exemption 5 – Category 1 – the deliberative process privilege as to Vaughn # 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 16, 18, and 19 and has released properly redacted portions of those documents.  The BIA has properly asserted that the handwritten notes in Vaughn # 14, 17, and 19 are exempt under Category 2 – mental impressions and correctly withheld or redacted those notes.  The BIA has legally withheld Vaughn # 20 under Category 3 – draft documents. NN has not specifically addressed the claim of attorney-client privilege for Vaughn # 3, 16, 19,

and 20 and it has conceded that the redaction of personal email addresses contained in Vaughn #
3 was proper.

> **B.      Adequate Search for Documents**

> **1.      Legal Standards**

NN's second principal claim is that the BIA failed to conduct an adequate search for
documents in response to NN's various FOIA requests.  The well-settled standard is that "the
agency must demonstrate that it has conducted a search reasonably calculated to uncover all
relevant documents."  *Weisberg v. United States Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir.
1984); *see also Maynard v. CIA*, 986 F.2d 547, 559 (1st Cir. 1993) ("The crucial issue is not
whether relevant documents *might* exist . . . .") (emphasis added).  It is also well-settled that "the
failure of an agency to turn up one specific document in its search does not alone render a search
inadequate."  *Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir.
2003); *see also Maynard*, 986 F.2d at 564.  In other words, "the adequacy of a FOIA search is
generally determined not by the fruits of the search, but by the appropriateness of the methods
used to carry out the search."  *Duenas Iturralde*, 315 F.3d at 315.

"In order to establish the adequacy of its search, the agency may rely upon affidavits
provided they are relatively detailed and nonconclusory, and are submitted by responsible
agency officials in good faith."  *Maynard*, 986 F.2d at 559.  The affidavit should at least
"describe in reasonable detail the scope and method by which the search was conducted . . . and
describe at least generally the structure of the agency's file system which makes further search
difficult."  *Id*.  The First Circuit has laid out the standard in the context of summary judgment:

> If an agency fails to establish through reasonably detailed
> affidavits that its search was reasonable, the FOIA requester may
> avert summary judgment merely by showing that the agency might
> have discovered a responsive document had the agency conducted

> a reasonable search. . . .  However, if an agency demonstrates that
> it has conducted a reasonably thorough search, the FOIA requester
> can rebut the agency's affidavit only by showing that the agency's
> search was not made in good faith. . . .  An agency's affidavit is
> accorded a presumption of good faith, which cannot be rebutted by
> purely speculative claims about the existence and discoverability
> of other documents.

*Maynard*, 986 F.2d at 560 (internal citations and quotation marks omitted).  Applying the *Maynard* standard to this case, if the Court concludes that the BIA did not conduct a reasonably thorough search, there is no question but that NN will have averted the BIA's motion for summary judgment, since the BIA has conceded that a number of documents should have been identified in its response to the July 11, 2005 request.

### 2.    The BIA Affidavits

The BIA filed two affidavits to support the adequacy of its search: that of Suzanne Langan, the FOIA Coordinator at the Eastern Regional Office of the BIA, and Darrell Strayhorn, FOIA Appeals Officer.  Mr. Strayhorn is the BIA employee who prepared the Vaughn index, and his affidavit clarifies how he made determinations as to the applicability of Exemption 5, Exemption 6, and the segregability of factual material.[18]  *Declaration of Darrell R. Strayhorn* ¶¶ 8-10 (Docket # 50-3).

Ms. Langan stated that she reviewed NN's June 8, 2005 FOIA request and determined that the proposed lease was the subject of the request.  *Second Declaration of Suzanne M. Langan* ¶ 3 (Docket # 50-2) (*Langan Aff.*).  She disbursed paper copies of the request to individuals she believed would hold responsive documents, including the Regional Director, the Deputy Regional Director of Trust Services, the Natural Resources Branch Chief and the Real

---

[18] As the focus of NN's argument is on the adequacy of the multiple BIA searches, not its classification of the documents in the Vaughn index, the Strayhorn affidavit is less probative on this issue than the Langan affidavit.

Estate Services Branch Chief; those individuals then either disbursed copies to the appropriate staff members, or personally searched the files.  *Id*.

Before filing a response to the first request,[19] the BIA received NN's second FOIA request dated July 11, 2005.  *Id*. ¶ 4.[20]  The BIA treated the second request as superseding the first.  *Id*.  Ms. Langan avers that she sent the second request to the same individuals.  *Id*. ¶ 5.  According to Ms. Langan, "[t]hese individuals searched their paper files, and [she] assisted the Real Estate Services Branch Chief."  *Id*.  She states that the search only turned up three documents responsive to the numbered paragraphs in the second FOIA request:  (1) the categorical exclusion checklist; (2) the Solicitor's Opinion; and (3) the pre-approval ground lease, which NN already had.  *Id*. ¶¶ 6-10.  On August 5, 2005, the BIA sent NN its response to the second request, releasing the categorical checklist, but withholding the Solicitor's Opinion under Exemption 5.  *Id*. ¶¶ 6, 7.

After the FOIA Appeals Office ordered the BIA to respond to the unnumbered paragraph of the request, the BIA conducted an additional search between October 6 and October 25, 2005.  *Id*. ¶ 10.  During that supplemental search, Ms. Langan and the Regional Realty Officer manually searched the paper files of the Real Estate Services Branch, and the "Regional Director, Deputy Regional Director, and Chief of the Natural Resources Branch conducted additional searches of their paper files and emails."  *Id*. ¶ 11.

After NN filed suit on December 6, 2005 to obtain the Solicitor's Opinion, the BIA released that document on April 6, 2006.  Because the Solicitor's Opinion referenced other documents, NN filed a third FOIA request dated May 12, 2006 seeking those documents.  With

---

[19] If the BIA received NN's first request by fax on June 8, 2005, its response would have been due within twenty business days – by July 7, 2005.

[20] Ms. Langan states that the BIA received this request on July 10, 2005, which fell on a Sunday; it is more likely that the BIA received the request on Monday, July 11, 2005, which is the date of the request.

respect to that request, Ms. Langan distributed copies of the request to the same individuals.  *Id.* ¶ 13.  This request was more specific about what documents NN was seeking, and so the BIA used search terms such as "Quoddy Bay or Passamaquoddy LNG Lease," "Appraisal of Fair Annual Rental-Eastern Band of Cherokee Indians," and "letter sent to Bureau of Indian Affairs (BIA) from the Passamaquoddy Pleasant Point Reservation's (Tribe's) expert in the field of natural gas plants."  *Id*.  The BIA responded to the request on June 8, 2006, releasing two documents, the "tribal resolution authorizing the Quoddy Bay Lease and a two-page draft of the Categorical Exclusion to the plaintiff," and withholding eleven documents under the FOIA exemptions.  *Id.*

### 3.      The BIA's Explanations Analyzed

In view of this troubling history of dribbling disclosure, the Court has reviewed Ms. Langan's affidavit to assess why the BIA's response failed to turn up documents that the BIA has since acknowledged it should have produced earlier.  In her affidavit, Ms. Langan makes four points regarding the BIA's responses to NN's multiple requests.  First, she notes that when the BIA responded to the first NN request, "many documents that would have been responsive to this FOIA request would have been newly created and possibly not yet filed."  *Langan Aff.* ¶ 3.  It would seem that this explanation should not apply to the BIA's response to the subsequent request of July 11, 2005, since by August 5, 2005, documents relating to the June 1, 2005 approval should have been captured by the filing system.  However, the possibility exists that the BIA missed some newly-created and unfiled documents in its first response and then, applying its more restrictive interpretation of the second request, it missed the same documents after they had been created and filed.  Whether this factor affected the BIA's response here is presumably

unknowable, since there is no evidence of any record of the temporal gap between the creation of the BIA's documents and their filing.

Second, the BIA's decision to interpret the second request as superseding the first also led to a more constrained response, since the second request – especially in the numbered paragraphs – was more specific than the broadly worded first request.[21]

Third, in its August 5, 2005 response, the BIA focused on only the numbered paragraphs in the July 11, 2005 request, not on the more general language at the unnumbered paragraph, and this focus restricted the parameters of its search.  Again, even though the DOI later determined that the BIA should have included the expansive definition of documents in the unnumbered paragraph, Ms. Langan's acknowledgement explains why its August 5, 2005 response was more limited.  She also states that following the DOI remand and applying the broader definition, she and her colleague manually searched the paper files in the Real Estate Services Branch and other supervisory personnel conducted additional searches of their paper files and emails.  But, this supplemental search in October 2005 led to the identification of only two additional documents.

Fourth, Ms. Langan explains that, when responding to the third FOIA request of May 12, 2006, she sent the request to the same individuals, but because the third FOIA request was not only more specific in terms of what documents were requested, but was interpreted more liberally, different search terms were used, resulting in the disclosure of two additional documents and the identification of eleven additional documents, which were then withheld under various exemptions.

Finally, in its memorandum, the BIA offered another explanation for why some documents were not identified.  It states that the ultimate conclusion that a document should be disclosed sometimes required a "layered analysis," that is, a complex review of each of the

---

[21] NN takes issue with the BIA's decision to treat the July 11, 2005 request as superseding, not cumulative.

potential exemptions and a judgment as to whether each separate exemption applied to the contents of the documents. *Defs.' Mot*. at 24-25.  The BIA concedes that based on its current layered analysis, some documents should have been identified, but it insists that a contrary conclusion during the response period does not mean the search itself was inadequate.

### 4.   The BIA's Response and *Maynard*

Upon analysis, Ms. Langan's affidavit is illuminating as to why all the documents that were ultimately identified were not found during the BIA's responses to the earlier FOIA requests.  The question is whether these explanations comport with the *Maynard* mandate.  Though less than explicit, the Langan affidavit gives glimpses into the structure of the BIA's filing system and the scope and nature of the search.

First, the BIA's final response to the third FOIA request is not at issue.  Even though NN is understandably skeptical about whether, even now, it has all documents responsive to its multiple requests, there is no evidence that the BIA has failed at this point to fully comply with the law in responding to the multiple FOIA requests.

Similarly, despite NN's contentions to the contrary, the BIA's conclusion that the second FOIA request replaced the first FOIA request is not indicative of an inadequate search.  As noted earlier, the BIA received the second FOIA request before it responded to the first FOIA request.  The first request is a general demand for all documents concerning the proposed construction and proposed lease for the LNG project.  As is apparent by the language of the first request, NN did not know that the BIA had already approved the lease when it filed the first FOIA request.[22]  In light of the BIA's approval of the lease, at least that portion of the June 8, 2005 FOIA request that asked for documents concerning the "proposed lease" had been eclipsed by the signing of

---

[22] NN's June 8, 2005 FOIA request asked for documents concerning the "proposed lease;" the lease was signed on June 1, 2005.

the lease.  Moreover, the second request was much more focused, asking for specific documents, including for example the Solicitor's Opinion, and more narrowly requesting documents concerning the BIA's decision to approve the ground lease.  Further, there was nothing on the face of NN's July 11, 2005 request to suggest whether it was supplementary or superseding.[23]  Nevertheless, since the first and second FOIA requests went from the general to the specific, it was not unreasonable for the BIA to conclude, without explicit guidance from the requester, that after the lease approval, NN had decided to present a more focused FOIA demand, restricting its request to the items listed in its July 11, 2005 request.

Under this analysis, the heart of NN's complaint, therefore, becomes the reasonableness of the BIA's response to the July 11, 2005 request.  Upon reviewing the Langan affidavit, the major reason the BIA's search failed to turn up the full range of responsive documents is the choice of the search terms.  Ms. Langan says that in July 2005, the BIA used the search term "Quoddy Bay or Passamaquoddy LNG Lease."  This was in response to NN's request for environmental review documents, the Solicitor's Opinion, and "all documents . . . concerning the decision of BIA to approve the ground lease between Passamaquoddy Reservation and Quoddy LLC."  Ms. Langan explained that "[e]ach branch maintains a centralized file for this transaction, which is known as the 'Quoddy Bay or Passamaquoddy LNG Lease.'"  *Langan Aff.* ¶ 3.  In light of the request and in light of the denomination of the centralized file, a search for documents restricted to the file name alone is logical and reasonable.  It is true that, later, the BIA search responding to the third request turned up additional documents by using different search phrases.

---

[23] It would have been helpful if NN had clarified its intention and equally helpful if the BIA had sought clarification.

However, this later search was responsive to the third request, which was both more detailed and broader than the second request. [24]

A secondary reason that the second search was less fruitful was Ms. Langan's focus upon the enumerated requests.  The first and second requests contained identical language in an unnumbered paragraph, which followed enumerated requests:

> This request includes, but is not limited to, reports, survey data, inter and intra-agency correspondence (both written and electronic), agency correspondence with the tribe and/or its members and with Quoddy, LLC (both written and electronic), maps, photographs, environmental studies, charts and graphs, and records of relevant phone calls, minutes of relevant meetings, and any other stated documents.

This language, [25] the absence of any enumeration, and its presence (unnumbered) at the bottom of the second and third FOIA requests suggest not an additional request, but a description of the inclusiveness and breadth of the documents sought in the enumerated paragraphs.  To the extent the BIA failed to interpret this unnumbered request as seeking documents not sought in the numbered requests, its response was not unreasonable and, in any event, the DOI cured the failure in its October 6, 2005 remand. [26]

Ms. Langan concedes that a third factor was that, following the October 6, 2005 DOI decision, the BIA "interpreted the later request more liberally than the July 11, 2005 request." *Langan Aff.* ¶ 13.  This concession is significant because the "agency . . . has a duty to construe a FOIA request liberally," *Nation Magazine*, 71 F.3d at 890, and under the law, the BIA should have construed the earlier requests liberally.  But, in the circumstances of this case, it is unclear

---

[24] It is also significant that the employees within the BIA from whom a response was sought for the second and third requests were identical.  Since the same people were asked, the differences in the responses must be largely tied to the use of different search terms.

[25] The wording sounds much like the precatory language that occasionally appears at the beginning of discovery documents, like interrogatories, seeking to foreclose the possibility of an excusable omission by defining the terms exhaustively.

[26] Adhering to the additional language produced only two additional documents – agency correspondence with the Tribe which was released in redacted form.

at best what, if any, actual impact the BIA's more restrained interpretation had on its earlier FOIA responses.[27]

Having analyzed Ms. Langan's affidavit, the Court concludes that the agency has satisfied the *Maynard* criteria by describing "in reasonable detail the scope and nature of the search" and "at least generally the structure of the agency's file system." *Maynard*, 986 F.2d at 559-60. Under *Maynard*, the Court's conclusion means that NN bears the burden of establishing that the BIA's "search was not made in good faith." *Id.* at 560. NN has not met this standard. Facially, there is cause for concern. The BIA never formally responded to the first request, responded less than completely to the second request, required NN to appeal its response to the DOI before identifying additional responsive documents, ended up defending a federal law suit seeking an order mandating a complete response, released one document months into the federal suit and then moved for summary judgment because it had done so, found a cache of additional documents only after a third request, and over two years after the first request, is now defending NN's amended law suit seeking a judicial order to compel a complete response to the third request. But, the BIA's explanation dispels the disturbing implications from this chronology. The causes are not related to an absence of good faith on the part of the BIA, but instead are related to the more mundane workings of its search function and its choice of search phrases.

## C.    Pattern and Practice

In Count III, NN alleges that the BIA has engaged, and continues to engage, in an "impermissible practice of delayed disclosure by not revealing the existence of documents and not releasing documents as required by the terms of the FOIA." *Am. Compl.* ¶ 50. "Even when an agency does not deny a FOIA request outright, the requesting party may still be able to claim

---

[27] It could be that the BIA would admit that its more restrained interpretation led to its conclusion that the second request replaced the first and its failure to appreciate that the unnumbered language was a separate request. Although possible, it is also speculative.

'improper' withholding by alleging that the agency has responded in an inadequate manner."
*United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 n.12 (1989).  Therefore, a
plaintiff may bring an independent claim alleging "a pattern and practice of unreasonable delay
in responding to FOIA requests."  *Liverman v. Office of the Inspector Gen.*, 139 Fed. Appx. 942,
944 (10th Cir. 2005) (quoting *Mayock v. Nelson*, 938 F.2d 1006, 1008 (9th Cir. 1991));[28] *see also*
*Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).  Therefore, "an
agency's failure to comply with the FOIA's time limits is, by itself, a violation of the FOIA."
*Gilmore v. United States Dep't of Energy*, 33 F. Supp. 2d 1184, 1187 (D. Cal. 1998) (finding that
an agency's pattern or practice of failing to make a timely response is itself a violation of the
FOIA, even though the documents were later determined to be exempt).[29]

The Court readily acknowledges that the chronology of this case is disturbing.  After all,
NN made its first FOIA request on June 8, 2005; the BIA released the redacted versions a year
later; and now over two years later, its requests for FOIA documents remain unresolved.  It is
difficult to construe such delay as a "reasonable delay."  A FOIA requester should not have to
undertake multiple requests, administrative appeals, and legal action in order to obtain
documents the law allows it to obtain.  It is also disturbing that the requested documents are
central to an issue of public and tribal significance, the building of an LNG terminal on tribal
lands, and that NN has taken a dissident view of the project, one that challenges its construction.
Without commenting on the merits of the project, the Court is concerned that the delay in
disclosing these documents leaves the BIA open to the charge that it has stonewalled the FOIA

---

[28] In *Mayock*, an immigration attorney brought suit against the INS alleging that "the INS has a pattern or practice of (1) failing to produce certain categories of FOIA information and (2) failing to comply with FOIA requests within the statutory, ten-day period."  *Id*. at 1007.

[29] In *Gilmore*, the district court denied a motion to dismiss filed by the agency on standing grounds, determining that the DOE's "failure to process Gilmore's FOIA request in a timely manner was itself an injury – an invasion of a legally protected interest . . . ."  *Id*. at 1189.  This is because "Congress has made it clear that a person filing a FOIA request has a concrete interest in prompt processing of that request."  *Id*.

request, because it asks for documents that will lead to increased public scrutiny.  If so, such actions are contrary to the letter and spirit of FOIA.  *Carpenter*, 470 F.3d at 437 ("The FOIA was intended to expose the operations of federal agencies 'to the light of public scrutiny.'").

Nevertheless, the Court is not convinced that the BIA's responses here represent the type of impermissible pattern and practice the law contemplates.  *Payne Enterprises*, a case NN relies upon, actually demonstrates the difference between a true "pattern and practice" case and the instant case.   In *Payne Enterprises*, a company that sold "information and advice about Government contracts to prospective contractors" had made repeated FOIA requests to officers at the Air Force Logistics Command (AFLC) for copies of bid abstracts.  837 F.2d at 487.  Because the competition for contracts was limited, and in order to keep the contract bids low, the AFLC refused to release the information to Payne, citing Exemptions 4 and 5.  However, in each case, the Secretary of the Air Force released the information on administrative appeal, "admonishing" the AFLC officers for their conduct.  *Id*. at 494.  The circuit court held that "the Secretary's inability to deal with AFLC officers' noncompliance with the FOIA, and the Air Force's persistent refusal to end a practice for which it offers no justification, entitle Payne to declaratory relief."   *Id*.   Even though Payne eventually received the information, *Payne Enterprises* concluded it was still entitled to judgment in its favor, because the delayed release of the information rendered it essentially useless for its purposes.  In this Court's view, the situation presented here simply does not amount to the egregious circumstances in *Payne Enterprises*.

### 1.    Solicitor's Opinion

The Solicitor's Opinion, over which this litigation was first initiated, illustrates the distinction.  The BIA initially withheld the Solicitor's Opinion under FOIA Exemption 5.  Four months after commencement of the instant litigation, however, the BIA released the Solicitor's

33

Opinion in full.  NN has cried foul, arguing that the BIA used delay tactics and forced NN to file suit to gain access to the document.  The Court sees it differently.  After reviewing the two-page document, the Court concludes that the Solicitor's Report would have fallen squarely within the deliberative process privilege of Exemption 5.  It is an "intra-agency memorandum," since Horace Clark, the BIA's Regional Solicitor for the Southeast Region, sent the document to Franklin Keel, the BIA's Regional Director for the Eastern Region.  Moreover, the Solicitor's Opinion is both predecisional and deliberative.  It predates the BIA's approval of the lease and is intended to assist Mr. Keel in making his decision, in that it offers advice about whether the BIA must comply with NEPA[30] before approving the lease.  The deliberative aspect of the memo is evidenced by the last line:  "It is our opinion that you may approve the lease."

The question remains:  If the document falls within Exemption 5, why did the BIA release it?  The likely answer is that once released, NN's lawsuit, which at that point focused solely on the Solicitor's Opinion, was rendered moot and after releasing the document, the BIA successfully moved for summary judgment on mootness grounds.  Although it could have properly withheld the document, the BIA decided to release it to end the federal litigation, albeit unsuccessfully.  Because the Court concludes that BIA's motive in its delayed release of the Solicitor's Opinion was strategic, NN has not met its burden to demonstrate that the BIA's motive was dilatory.  At most, NN has demonstrated that the BIA delayed releasing a document it was entitled not to release.

### 2.    Vaughn Index Documents

As for the documents contained in the Vaughn index, the BIA did not disclose the redacted versions of these documents to NN until June 8, 2006 – nearly a year after NN's FOIA request, and more than six months after filing suit in federal court.  Although the BIA correctly

---

[30] National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*

points out that eleven of the twenty did not even exist at the time of NN's July 11, 2005 FOIA request, BIA could have identified nine as responsive to NN's request.[31]

Perhaps the BIA should have found these documents during its first search; nevertheless, its failure to do so does not justify a finding that the BIA engaged in an impermissible pattern or practice of delayed disclosure. Unlike the AFLC in *Payne Enterprises*, the BIA nearly always invoked proper FOIA exemptions to the disclosure of documents, and followed DOI orders to broaden its search on remand.[32] The vast bulk of the BIA's delay was caused by inefficiencies, rather than a "practice of unjustified delay." *Payne Enterprises*, 837 F.2d at 488. The Court grants summary judgment in favor of the BIA on Count III.

## IV.   CONCLUSION

The Court GRANTS the Defendant's Amended Motion for Summary Judgment (Docket # 59), and DENIES Plaintiff's Cross-Motion for Summary Judgment (Docket # 55).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of June, 2007

---

[31] One of those nine, Vaughn # 8, was created four days after the July 11, 2005 request, making it responsive to NN's FOIA request.

[32] As NN points out, DOI found that the BIA improperly invoked Exemption 5 with respect to Vaughn # 15 and 17, because the documents did not originate in a government agency. *Pl.'s Mot.* at 20.