UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NULANKEYUTMONEN | ) | |
| NKIHTAQMIKON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-05-188-B-W |
| | ) | |
| BUREAU OF INDIAN AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

**SECOND ORDER ON PLAINTIFF'S REQUEST FOR RELIEF**

In this long-pending Freedom of Information Act (FOIA) litigation, the Court concludes

that by failing to timely identify documents responsive to FOIA requests, the Bureau of Indian

Affairs (BIA) violated FOIA, and the Court orders the Solicitor of the Department of the Interior

(DOI) or her designee to certify that no previously unidentified FOIA-susceptible records exist

within the agency. The Court allows the Plaintiff's attorney to petition for attorney's fees and

costs, but only for legal services upon which the Plaintiff substantially prevailed. The Court

denies the Plaintiff's other demands for relief, including its claim that the BIA's FOIA violation

in this case represents a larger pattern or practice of FOIA violations.

**I.      STATEMENT OF FACTS**

**A.      The Travel of the Case**

This case has a tortuous history. It is a tagalong action to a contentious dispute between

Nulankeyutmonen Nkihtaqmikon (NN), a dissident group within the Pleasant Point

Passamaquoddy Reservation, and the BIA over the BIA's June 1, 2005 approval of a ground

lease between Quoddy Bay, LLC (Quoddy Bay) and the Pleasant Point Passamaquoddy

Reservation for the proposed construction of a Liquefied Natural Gas (LNG) terminal on tribal

land.[1]   While NN's law suit challenging the BIA's approval of the lease was pending, NN filed this action under FOIA, 5 U.S.C. § 552, seeking the release of agency records it claimed were "unlawfully withheld by the Bureau of Indian Affairs and the U.S. [DOI]."[2]   *Compl. for Declaratory and Injunctive Relief* at 1 (Docket # 1).   On May 25, 2006, the BIA moved for summary judgment.   *Defs.' Mot. for Summ. J.* (Docket # 11).   After the parties engaged in some complicated maneuvering, the Court issued its first opinion in this case on September 25, 2006, setting the stage for an amended complaint regarding recently identified, but not disclosed documents, and a dismissal of Count I, regarding the Solicitor's Opinion, which the BIA had disclosed.   *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 453 F. Supp. 2d 193 (D. Me. 2006) (*NNI*).

After a delay caused by the preparation of a Vaughn index, the BIA filed an amended motion for summary judgment on December 1, 2006 and NN filed a cross-motion for summary judgment on December 22, 2006.   *Defs.' Mot. for Summ. J.* (Docket # 49); *Pl.'s Cross-Mot. for Summ. J.* (Docket # 55).   Despite what the Court characterized as a "troubling history of dribbling disclosure," on June 22, 2007, the Court granted BIA's amended motion and denied NN's cross-motion.   *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 493 F. Supp. 2d 91 (D. Me. 2007) (*NNII*).   A main basis for the Court's decision was that many of the documents were "predecisional" and protected from disclosure by the deliberative process privilege.   *Id.* at 102-04.   Although the BIA fixed the date for the final agency action for waiving the need for an appraisal as June 1, 2005, it maintained that "as regards other issues, including the approval of the ground lease, . . . the documents relate to the ongoing decisional process

---

[1] "Nulankeyutmonen Nkihtaqmikon," also spelled "Nulankeyutmonen Nkihtahkomikumon," translates into English from Passamaquoddy as "We Protect the Homeland." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 23 n.1 (1st Cir. 2007).

[2] Technically, there are two defendants to this law suit, the BIA and the DOI, but for ease of reference, the Court refers only to the BIA, whose actions are squarely at issue in this case.

required for [Federal Energy Regulatory Commission (FERC)] approval." *Id.* at 103.  Accepting the BIA's representation, the Court concluded that documents after June 1, 2005 were indeed predecisional, and denied NN's FOIA request.  *Id.* at 107.  NN appealed to the Court of Appeals for the First Circuit.

Meanwhile, the companion case wended its way through federal court, and, as it happened, a critical issue in that case was whether the June 1, 2005 lease approval was final. Before this Court, the BIA maintained that its approval of the ground lease was contingent upon FERC approval, that NN lacked standing to challenge a preliminary approval, and that in any event its claims were not ripe.  *Nulankeyutmonen Nkihtaqmikon v. Impson*, 462 F. Supp. 2d 86, 92-93 (D. Me. 2006).  The Court agreed; NN appealed.  On appeal, however, the BIA changed position regarding the finality of its lease approval, and conceded that its June 1, 2005 lease approval was final.  *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26 (1st Cir. 2007) (*NNIII*).  On September 14, 2007, the First Circuit reversed, "based in large part on the BIA's change of position on appeal."  *Id.* at 23.

The BIA's concession directly affected NN's FOIA claim, since the BIA could no longer plausibly maintain that the documents created after June 1, 2005 were predecisional.  On June 16, 2008, the First Circuit agreed with NN that the BIA's change in position "altered the analysis of whether certain documents at issue are actually 'predecisional' for purposes of the 'decisional process privilege' codified at 5 U.S.C. § 552(b)(5)."  *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, No. 07-2290, 2008 U.S. App. LEXIS 27455, at *1 (1st Cir. June 16, 2008) (*NNIV*).  The First Circuit remanded the FOIA case to this Court.  *Id.* at *2.

On June 19, 2008, NN filed a motion for relief from judgment, which the Court granted on March 4, 2009.  *Pl.-Appellant's Rule 60(b) Mot. for Relief from J.* (Docket # 84) (*Pl.'s Rule*

*60(b) Mot.*); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 601 F. Supp. 2d 337 (D. Me. 2009) (*NNV*).  On April 1, 2009, the First Circuit, having reviewed an interim BIA status report and the Court's March 4, 2009 Order granting relief from judgment, remanded the case to this Court.  *J.* (Docket # 97).  The Court held a telephone conference with the parties on April 10, 2009.  *Tr. of Proceedings* (Docket # 101).  After the First Circuit decision, but before the mandate, on April 17, 2009, the BIA filed a status report in accordance with the Holder memorandum in which it made discretionary disclosures of a number of previously withheld documents.  *Second Status Report* (Docket # 99).

NN filed a memorandum on April 24, 2009 and the BIA responded on May 1, 2009. *Pl.'s Req. for Relief* (Docket # 100) (*Pl.'s Req.*); *Resp. to Pl.'s Req. for Relief* (Docket # 102) (*BIA Resp.*).    The BIA supplied supplemental authority on July 28, 2009.    *Notice of Supplemental Authority* (Docket # 104).  On November 13, 2009, the Court issued an Order, denying NN's FOIA request for the Keel and Trickey Memoranda.  *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, CV-05-188-B-W, 2009 U.S. Dist. LEXIS 106366 (D. Me. Nov. 13, 2009) (*NNVI*).  In the Order, the Court noted that the BIA had not yet responded to the substance of NN's demand for declaratory and injunctive relief and ordered the scheduling of a conference of counsel, since it would be "unfair to reach NN's remaining requests for relief" without a BIA response.  *Id.* at *7.

On November 18, 2009, the Court held a conference of counsel to address the disposition of the unresolved issues in NN's pending motion for relief.  At the conference, the Court reviewed the status of the case, and noted that NN had fully briefed the remaining issues, and

although the BIA had not responded, it had signaled an interest in doing so.[3]  The Court asked

the BIA if it wished to file a responsive memorandum.  The BIA declined.  The parties advised

the Court that the remaining issues were in order for decision.

### B.      The Remaining Issues

#### 1.      NN's Contentions:  A Summary

On April 24, 2009, NN filed a twenty-seven page memorandum, setting forth what it said

were "(1) BIA's unreasonable and inadequate searches for documents; (2) BIA's wrongful

withholding of documents for nearly four years under the deliberative process privilege; and (3)

BIA's pattern and practice of inadequate searches, wrongful withholding, and egregious delays

in disclosing documents under FOIA."  *Pl.'s Req.* at 1.  NN's memorandum discusses in detail its

side of this dispute, replete with citations to statutory and case law; NN demands the following

relief:

1) A judicial declaration that the BIA's searches were inadequate, unreasonable,
   and violated FOIA;

2) An order that the BIA provide a supplemental affidavit from a senior BIA
   official confirming that all files that could contain responsive documents have
   been searched and that no additional documents exist;

3) An order that the BIA conduct another search to confirm whether it has any
   additional documents responsive to NN'S FOIA requests;

4) An order that the BIA reform its search procedures to ensure that agency
   personnel will construe FOIA liberally in favor of disclosure and otherwise
   fulfill the agency's responsibilities under FOIA in the future;

---

[3] In its original response to NN's request for relief, the BIA noted that "if the Court would like the parties to provide additional briefing on any issue in the case, [it] request[s] leave to respond further to Plaintiff's Request for Relief." *BIA Resp.* at 3.

5) A judicial declaration that the BIA's withholding of documents post-dating June 1, 2005 for nearly four years under the deliberative process privilege violated FOIA;

6) An order compelling the BIA to construe all FOIA exemptions narrowly and apply the deliberative process privilege only to predecisional documents in the future;

7) A declaration that the BIA engaged in a pattern and practice of delayed and incomplete disclosures and improper withholding of documents in violation of FOIA;

8) An order requiring the BIA to amend its FOIA handbook, guidance documents, policies, and procedures to ensure complete and timely compliance with FOIA in the future; and,

9) An order authorizing NN to submit a petition for recovery of attorney's fees and costs incurred in this matter.

### 2.       The BIA's Silence

Faced with a long list of demands in the context of a contentious case where its failure to disclose relevant FOIA documents has already been the subject of judicial disapproval, the BIA forewent the opportunity to present its side of the case, to describe why in its view, its actions do not merit the relief NN demands, and to attempt to mitigate to the harsh view of the BIA's delayed compliance that NN is pressing.  The BIA's silence is peculiar.  FOIA contemplates that an agency accused of improperly withholding FOIA documents will come forward and explain its decisions.  5 U.S.C. § 552(a)(4)(B) (providing that the "burden is on the agency to sustain its

action"). The Court does not know what to make of the BIA's declination, since the BIA has in effect deserted the field during the last critical moments of the contest.

It is true that to some extent the BIA previously answered some of the pending contentions, and in fairness to the BIA, in arriving at its decision, the Court has undertaken an unguided search through the BIA's prior filings to determine whether they respond to NN's current allegations.[4] However, NN's most salient contention is that the BIA's overall pattern of conduct throughout the FOIA controversy justifies the remedies NN is demanding, and on this essential point, NN's argument remains unanswered. It is not the Court's role to act as a party's advocate and to supply the BIA the defense it consciously failed to supply for itself.[5]

### C.    An Overview of the BIA's Responses to NN's FOIA Requests

The Court is no stranger to the roiling controversy between NN and the BIA regarding the agency's approval of the Pleasant Point ground lease and the BIA's responses to NN's FOIA requests. *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 453 F. Supp. 2d 193 (D. Me. 2006); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 450 F. Supp. 2d 113 (D. Me. 2006); *Nulankeyutmonen Nkihtaqmikon v. Impson*, 462 F. Supp. 2d 86 (D. Me. 2006), *affirmed in part and reversed in part*, 503 F.3d 19 (1st Cir. Sept. 14, 2007); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 493 F. Supp. 2d 91 (D. Me. 2007); *stay granted*, No. 07-2290, 2008 U.S. App. LEXIS 27455 (1st Cir. June 16, 2008); *Nulankeyutmonen Nkihtaqmikon v. Impson*, 251 F.R.D. 64 (D. Me. 2008); *Nulankeyutmonen Nkihtaqmikon v. Impson*, 573 F. Supp. 2d 311 (D. Me. 2008), *affirmed* No. 08-2122, 2009 U.S. App. LEXIS

---

[4] To the extent it responded to NN's contentions in its May 1, 2009 memorandum, the BIA simply listed six prior filings. *BIA Resp.* at 2. It has not brought the Court's attention to any specific relevant portions of those multi-page filings. Without any guidance from BIA counsel, the Court has done its best to review all its filings to glean its argument.

[5] The Court considered ordering the BIA to defend itself, but as the BIA is represented by government counsel, both in Washington, D.C. and in Maine, the Court decided not to interfere with what must be a deliberate choice.

23714 (1st Cir. Oct. 28, 2009); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 601 F. Supp. 2d 337 (D. Me. 2009); *Nulankeyutmonen Nkihtaqmikon v. Impson*, No. 08-2122, 2009 U.S. App. LEXIS 23714 (1st Cir. Oct. 28, 2009); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, CV-05-188-B-W, 2009 U.S. Dist. LEXIS 106366 (D. Me. Nov. 13, 2009).  The facts underlying the FOIA controversy between NN and the BIA are set forth in detail in the FOIA decisions.  However, to provide context, the Court will summarize developments in further detail.

### 1.    NN's June 9, 2005 FOIA Request

The genesis of this case can be traced to a June 9, 2005 FOIA request that NN's representative, the Environmental and Natural Resources Law Clinic (ENRLC) at Vermont Law School, which has represented NN, faxed to the BIA Eastern Regional Office, seeking documents relating to the proposed construction of the LNG terminal by Quoddy Bay around Pleasant Point, and documents relating to the proposed lease of tribal land to Quoddy Bay.  *NNI*, 453 F. Supp. 2d at 196.  The same day a student clinician at the ENRLC telephoned Suzanne M. Langan, the FOIA Coordinator at the Eastern Regional Office of the BIA, and Ms. Langan informed her that "the only document that the BIA had in connection with our faxed FOIA request, or the Quoddy LLC ground lease agreement, or the [LNG] project proposal, was the ground lease itself."  *Pl.'s Opposing Statement of Material Facts*, Ex. C, *Aff. of Emily Plett-Miyake* at 2 (Docket # 15).

### 2.    NN's July 11, 2005 FOIA Request and the BIA's August 5, 2005 Response

On July 11, 2005, NN mailed a second, more formal FOIA request to the BIA, seeking release of the Solicitor's Opinion and three other categories of information:

1. The environmental review documents, prepared either by BIA or the Sipayik Environmental Department, and any other environmental documents relied upon;

2. The Solicitor's Opinion regarding the decision to approve the lease;

3. Information regarding any appeal process that may be available for this decision through the BIA or the Department of Interior; and,

4. All documents in your possession and control concerning the decision of BIA to approve the ground lease between Passamaquoddy Reservation and Quoddy [Bay].

*Def.'s Statement of Material Facts*, Ex. A at 1 (Docket # 12) (*DSMF*).  The BIA responded on August 5, 2005. *Id.* ¶ 2.  With respect to the first request, the environmental review documents, the BIA released the Categorical Exclusion checklist and Ms. Langan stated under oath that the BIA had "released all documents responsive to Item 1." *Id. Decl. of Suzanne M. Langan* ¶ 3 (*Langan Decl.*).  With respect to the second request, the Solicitor's Opinion, the BIA withheld the document in its entirety pursuant to FOIA Exemption 5 for inter-agency or intra-agency communications. *NNI*, 453 F. Supp. 2d at 197.  With respect to the third request, the appeal process, the BIA said that it was not required to "fulfill an 'information' request" and NN may "feel free to resubmit [its] request citing specific documents regarding the appeal process." *Id.* at n.6.  Without respect to the fourth request, documents relating to the approval of the ground lease, the BIA stated that "NN already possessed the only document in question, namely a copy of the ground lease." *Id.* at 197.

### 3.	NN's September 1, 2005 FOIA Appeal and the BIA October 25, 2005 Release of Further Documents

On September 1, 2005, NN filed a FOIA appeal.  *Id.*  NN asserted "that the BIA did not properly consider the scope of its request or the type of documents requested, challenged the BIA's use of Exemption 5, and contested its refusal to fill an 'information' request, regarding the lease approval appeal process."  *Id.* at 197-98.  On October 6, 2005, the DOI issued a decision partially granting NN's FOIA request for documents related to the lease approval, noted that the BIA incorrectly dismissed the request on the ground that NN had requested information, rather than documents, and the DOI further ruled that the BIA was required to provide an estimate of the volume of withheld information.  *Id.* at 198.  The DOI did not address the request for the Solicitor's Opinion.  *Id.*  On October 25, 2005, the BIA released two documents, one of which was partially redacted.[6]  It withheld the Solicitor's Opinion letter, and estimated that the entire volume of withheld documents was three pages.  *Id.*

### 4.    NN's FOIA Lawsuit and NN's May 12, 2006 FOIA Request

On December 6, 2005, NN filed this FOIA lawsuit.  *Compl.* (Docket # 1).  As this case proceeded, on April 6, 2006, the BIA released the Solicitor's Opinion, the text of the opinion revealed the existence of other previously unidentified documents responsive to NN's July 11, 2005 FOIA request.  *NNI*, 453 F. Supp. 2d at 198.  On May 12, 2006, NN filed a third FOIA request, asking for the following:

1. The letter sent to the BIA from the Tribe's expert in the field of natural gas plants, describing advice to the Tribe concerning the reasonableness of the lease agreement, as referenced in the Solicitor's Memorandum prepared by Horace G. Clark, dated May 26, 2005.
2. All documents relating to the above letter.
3. All documents in your possession and control relating to the Tribe's decision to approve the lease agreement and all documents relating to the Tribe's decision to waive an appraisal by the BIA.

---

[6] The partially redacted document was a letter "addressed to Mr. Franklin Keel, Regional Director [of the BIA], from Mr. Craig Francis, General Counsel to the [Passamaquoddy] Tribe."  *DSMF* Ex. C at 1.  The BIA did not identify the other released document.

4. All documents relating to the BIA's decision to approve the lease agreement, all documents relating to the BIA's decision to forego environmental analysis under NEPA, and all documents relating to the BIA's decision not to conduct an appraisal of fair annual rental for the leased land, including, but not limited to, the Memorandum of March 18, 2003, "Appraisal of Fair Annual Rental – Eastern Band of Cherokee Indians," as referenced in the Solicitor's Memorandum of May 26, 2005.

This request includes, but is not limited to, reports, survey data, inter and intra-agency correspondence (both written and electronic), agency correspondence with the tribe and/or its members and with Quoddy Bay, LLC (both written and electronic), maps, photographs, environmental studies, charts and graphs, and records of relevant phone calls, minutes of relevant meetings, and any other related documents.

*NNII*, 493 F. Supp. 2d at 98-99.  On June 8, 2006, the BIA responded to the May 12, 2006 FOIA request, releasing two additional documents, the tribal resolution authorizing the ground lease and a categorical exclusion checklist.  *Id.* at 99.  The BIA also disclosed the existence of eleven additional documents responsive to NN's July 11, 2005 FOIA request, but withheld the documents under FOIA exemptions 4 and 5.  *Id.*

## 5. NN's June 21, 2006 DOI Appeal and the September 18, 2006 DOI Decision

On June 21, 2006, NN issued a second appeal to the DOI from the BIA's decision to withhold these documents.  *Id.*  On September 14, 2006, the DOI issued a decision, addressing a total of twenty disputed documents.  *Id.*  It released fourteen in part or in full, corrected the BIA's response by observing that the BIA had actually withheld nineteen documents, and deferred ruling on the applicability of Exemption 4 to the letter from the Tribe's expert and of Exemption 5 to two additional documents.  *Id.* at 99-100.  The DOI agreed with the BIA's withholding of the remaining seventeen documents under the deliberative process privilege, the attorney-client privilege, and the personal privacy privilege.  *Id.* at 100.

11

### 6.   *NNI*:  September 25, 2006 Order and Subsequent Filings

On September 25, 2006, the Court issued its first FOIA decision in this case.  The Court observed that in Count I of its Complaint, NN demanded that the BIA produce the Solicitor's Opinion, and that the BIA had done so.  *NNI*, 453 F. Supp. 2d at 200.  This rendered Count I moot, and the Court dismissed it.  *Id.*  Ordinarily, the disclosure of the only document referred to in the complaint would end the matter.  However, finding that the BIA had "repeatedly misinformed NN regarding the extent of documents responsive to its FOIA requests" and it was apparent there was an ongoing controversy about the ten non-disclosed BIA documents, the Court stayed the action to allow NN to amend its motion to supplement its original complaint.  *Id.* at 200-03.  After NN moved to file an amended complaint, the Court granted the motion, treated the BIA's motion for summary judgment as a motion to dismiss, and granted it as to Count I regarding the Solicitor's Opinion, but leaving the case intact as regards Count II.  *Pl.'s Mot. to Amend Compl.* (Docket # 30); *Order on Pl.'s Mot. to Amend Compl.* (Docket # 33); *Second Order on Defs.' Mot. for Summ. J.* (Docket # 34).

On November 22, 2006, the BIA filed the Vaughn index with the Court, outlining the documents responsive to NN's FOIA requests and itemizing the status of each document (released in full, redacted, or withheld).  *NNII*, 493 F. Supp. 2d at 101-02.  The Vaughn index identified twenty documents responsive to NN's FOIA request of May 12, 2006.  *Id.*  On December 22, 2006, NN filed a cross-motion for summary judgment.  *Pl.'s Cross-Mot. for Summ. J.* (Docket # 55).  On December 28, 2006, the BIA filed an amended motion for summary judgment, based on the contents of the Vaughn index.  *Defs.' Am. Mot. for Summ. J.* (Docket # 59).  After responsive memoranda and oral argument, the motions were ready for decision.

### 7.   *NNII*:  June 22, 2007 Order

On June 22, 2007, the Court issued its second FOIA Order. *NNII*, 493 F. Supp. 2d 91. The BIA claimed that many of the withheld documents were subject to the deliberative process privilege. *Id.* at 102-04. To qualify for the deliberative process privilege, a document must be "(1) predecisional, that is 'antecedent to the adoption of the agency policy,' and (2) deliberative, that is, actually 'related to the process by which policies are formulated.'" *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995) (quoting *National Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (1st Cir. 1988)). Significantly, the BIA identified June 1, 2005 as the decision date only for its decision to waive an appraisal; otherwise, the BIA contended that "the documents relate to the ongoing decisional process required for FERC approval and point[ed] to the contingent nature of its June 1, 2005 action." *NNII*, 493 F. Supp. 2d at 103. Based largely on the BIA's representation, on June 22, 2007, the Court granted the BIA's motion for summary judgment and denied NN's cross-motion. *Id.* at 116. On August 17, 2007, NN appealed to the First Circuit. *Notice of Appeal* (Docket # 76).

### 8.    *NNIII*:  The September 14, 2007 First Circuit Decision

Meanwhile, NN's companion action against the BIA's approval of the Pleasant Point ground lease was proceeding through federal court. In other decisions, this Court and the First Circuit exhaustively described the complicated set of factual and legal issues in that case. For purposes of this action, however, what is critical is that on appeal before the First Circuit, the BIA changed its position regarding the finality of the June 1, 2005 decision. *NNIII*, 503 F.3d at 23 (stating that its reversal of the Court's decision was "based in large part on the BIA's change of position on appeal regarding the finality of its lease approval"). The BIA's change of position regarding the finality of its June 1, 2005 decision on the ground lease had a direct impact on the

FOIA litigation, because the BIA could no longer claim the deliberative process privilege for documents after June 1, 2005 related to that decision.

### 9.    *NNIV*:  **The June 16, 2008 First Circuit Decision**

Once the First Circuit was made aware of the potential impact of the BIA's change of position, it issued a brief opinion, remanding the case back to district court, noting that it was "prudent to stay any further briefing and [to] invite [NN] to proceed in the district court."  *NNIV*, 2008 U.S. App. LEXIS 27455, at *1-2.

### 10.    *NNV*:  **The March 4, 2009 Order**

On March 4, 2009, the Court addressed the issues on remand, and granted NN's Rule 60(b) motion for relief from judgment, setting the stage for this motion.  *NNV*, 601 F. Supp. 2d at 343.

### 11.    *NNVI*:  **The November 13, 2009 Order**

NN still sought two documents that the BIA had refused to disclose, the so-called Keel and Trickey memoranda, and on November 13, 2009, the Court issued an Order, denying NN's demand for those documents, concluding that they were subject to the deliberative process privilege.  *NNVI*, 2009 U.S. Dist. LEXIS 106366, at *12-13.

### D.    NN's Specific Contentions

In its memorandum, NN sets forth the chronology of FOIA requests and BIA responses:

1) June 9, 2005:  First FOIA Request

2) June 9, 2005 BIA Response:  The BIA asserted that only one responsive document exists – the ground lease it previously provided.

3) July 11, 2005:  Second FOIA Request

4) <u>August 5, 2005 BIA Response</u>:  The BIA claimed that two responsive documents exist, a categorical exclusion checklist, which BIA provided, and a Solicitor's Opinion letter, which it withheld.

5) <u>October 25, 2005 BIA Response</u>:  The BIA released two additional responsive documents, one of which was fully disclosed and the other of which was disclosed in redacted form.

6) <u>April 6, 2006 BIA Response</u>:  The BIA released the Solicitor's Opinion letter.

7) <u>May 12, 2006:  Third FOIA Request</u>

8) <u>June 8, 2006 BIA Response</u>:  The BIA released two additional documents, and identified eleven new documents that it withheld.

9) <u>September 14, 2006 BIA Response</u>:  The DOI issued an order concerning twenty withheld documents, releasing some in whole or in part, deferring ruling on others, and upholding non-disclosure of a third group.[7]

10) <u>November 22, 2006 BIA Response</u>:  The BIA filed a Vaughn index identifying twenty documents.

11) <u>December 13, 2007 BIA Response</u>:  The BIA filed an administrative record in the companion case, *Nulankeyutmonen Nkihtaqmikon v. Impson*, CV-05-168 (Docket # 72), revealing the existence of five additional documents, not previously identified.

12) <u>June 25, 2008 BIA Response</u>:  The BIA identified sixteen additional responsive documents.

13) <u>April 17, 2009 BIA Response</u>:  The BIA filed a status report, and disclosed fifteen documents it had previously withheld.

---

[7] Tracking the exact number of documents identified and disclosed is hopeless and pointless, since some of the same documents are counted multiple times.  The chronology here reflects in general terms the history of sporadic identification and disclosure.

## II.    DISCUSSION

### A.    FOIA Law:  An Overview

FOIA was intended "to establish a general philosophy of full agency disclosure and to close the loopholes which allow agencies to deny legitimate information to the public," *GTE Sylvania, Inc. v. Consumers Union of the U.S., Inc.*, 445 U.S. 375, 385 (1980) (citations and internal quotation marks omitted), and to expose the operations of federal agencies "to the light of public scrutiny." *Carpenter v. U.S. Dep't of Justice*. 470 F.3d 434, 437 (1st Cir. 2006) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976)).  FOIA directs federal agencies to provide public access to their records unless the materials fall into one of the exemptions in the Act.  See 5 U.S.C. § 552(a)(3).  When the agency asserts that its documents are exempt from disclosure, the "government bears the burden of demonstrating the applicability of a claimed exemption . . . and the district court must determine *de novo* whether the queried agency has met this burden . . . ." *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 228 (1st Cir. 1994) (citations omitted).  "The nine FOIA exemptions are to be construed narrowly, with any doubts resolved in favor of disclosure." *Carpenter*, 470 F.3d at 438. Although each FOIA request must reasonably describe the records sought, the "agency also has a duty to construe a FOIA request liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).

FOIA mandates that once an agency receives a FOIA request, the agency shall "determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination."   5 U.S.C. §

16

552(a)(6)(A)(i); *Long v. U.S. Internal Revenue Serv.*, 693 F.2d 907, 910 (9th Cir. 1982) (stating that the agency's "unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses"); *Info. Network for Responsible Mining v. Bureau of Land Mgmt.*, 611 F. Supp. 2d 1178, 1183 (D.C. Col. 2009) (finding that "BLM violated FOIA by failing to comply with this statutory deadline"); *Oregon Natural Desert Ass'n v. Gutierrez*, 409 F. Supp. 2d 1237, 1248 (D. Or. 2006) (holding that "an untimely response is a violation of FOIA, regardless of the final outcome of the request"); *Gilmore v. U.S. Dep't of Energy*, 33 F. Supp. 2d 1184, 1188 (N.D. Cal. 1998) (finding that the agency's "failure to make a timely determination as to whether [the] . . . documents should be disclosed constituted an improper withholding of those documents in violation of the FOIA").

There is a well-settled standard to determine whether an agency's record search is adequate under FOIA: "The agency must demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't. of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (quotation marks omitted); *Maynard v. Central Intelligence Agency*, 986 F.2d 547, 559 (1st Cir. 1993) (stating that "[t]he adequacy of an agency's search for documents under FOIA is judged by a standard of reasonableness and depends upon the facts of each case"). At the same time, FOIA requires "a 'reasonable' search not an exhaustive one." *Sephton v. Fed. Bureau of Investigation*, 442 F.3d 27, 29 (1st Cir. 2006).

### B.    Organization of Opinion

NN demands different types of relief. First, it asks that the Court issue orders against the BIA concerning its handling of NN's specific FOIA requests in this case. Second, it asks that the Court issue orders against the BIA concerning its handling of FOIA requests generally. Lastly, it asks for an award of attorney's fees. Further, NN contends that the BIA violated FOIA by

failing to perform an adequate and timely search and by the legal positions it took in claiming FOIA exemptions to disclosure. The Court will address these issues separately.

### C.     The BIA's Responses to NN's FOIA Requests

#### 1.     The June 9, 2005 Faxed Request

NN presented evidence that it faxed its first FOIA request to the BIA on June 9, 2005, that a student at Vermont Law's ENRLC spoke with Suzanne M. Langan, the FOIA Coordinator at the Eastern Regional Office of the BIA, the same day, and that Ms. Langan informed her that the only document responsive to its FOIA request was the ground lease itself, a document NN already possessed. The BIA did not initially respond to NN's contentions about the June 9, 2005 FOIA request. Ms. Langan filed a Declaration on May 25, 2006 concerning her involvement in the case, but she began with NN's July 11, 2005 FOIA request. *Langan Decl.* ¶ 1.

On December 1, 2006, Ms. Langan submitted a second declaration in which she discussed the June 9, 2005 FOIA request. *Second Decl. of Suzanne M. Langan* Ex. A (Docket # 50) (*Second Langan Decl.*). Ms. Langan explained that after she began to process the BIA response to the June 9, 2005 FOIA request, she received the July 11, 2005 request, and she "treated the July 11, 2005 request as having superseded the June 9, 2005 request." *Id.* at 2-3. The Court accepts this explanation.

#### 2.     July 11, 2005 Request[8]

##### a.     The First Langan Declaration:  May 10, 2006

---

[8] Although NN agrees that "the heart of NN's complaint" is "the reasonableness of BIA's response to the July 11, 2005 request," *Pl.'s Req.* at 9 n.3 (quoting *NNII*, 493 F. Supp. 2d at 112), it still notes that "the same analysis (and BIA's shortcomings) would apply to all of NN's FOIA requests, including the June [9], 2005 request and the May 12, 2006 request." *Id.*; *see NNII*, 493 F. Supp. 2d at 96 n.4, 111-12. The Court focuses its analysis on the July 11, 2005 FOIA request, since it is the primary operative request and since consideration of the other two requests would be redundant.

Setting aside for the moment prior events, on May 10, 2006, Ms. Langan of the BIA swore out a declaration, setting forth the BIA's position at that time. *Langan Decl.* She reviewed the fact that NN had requested "four items of information." *Id.* ¶ 2. Item 1 requested "[t]he environmental review documents, prepared either by BIA or Sipayik Environmental Department, and any other environmental documents relied upon." *Id.* Ex. A. Ms. Langan asserted that in its initial response of August 5, 2005, the BIA had "released all documents responsive to Item 1." *Id.* ¶ 3. Item 2 requested the Solicitor's Opinion. *Id.* Ex. A. Ms. Langan observed that the BIA had originally withheld the opinion under the deliberative process privilege, but on April 6, 2006, had released "all three pages of the Solicitor's Opinion." *Id.* ¶¶ 3, 6. Item 3 requested "[i]nformation regarding any appeal process." *Id.* Ex. A. Ms. Langan said that the BIA had "requested clarification and specific references for the documents sought." *Id.* ¶ 3. Item 4 requested "[a]ll documents in your possession and control concerning the decision of BIA to approve the ground lease between Passamaquoddy Reservation and Quoddy, LLC." *Id.* Ex. A. Ms. Langan stated that "BIA identified Item 4 as a document Plaintiff already possessed." *Id.* ¶ 3. Finally, Ms. Langan stated that after the DOI remanded the case to the BIA, it "located two additional documents potentially responsive to the FOIA request" and that it "released the documents with redactions . . . on October 25, 2005." *Id.* ¶ 5.

Relying on the Langan Declaration, in its May 25, 2006 memorandum, the BIA represented to the Court that "[t]he sole controversy before the Court was resolved when BIA voluntarily released to plaintiff the only document previously withheld under the FOIA." *Defs.' Mot. for Summ. J.* at 6 (Docket # 11). Having disclosed all the documents responsive to the FOIA request, the BIA urged the Court to grant summary judgment "because there is no controversy for the court to consider." *Id.* at 7. The DOI's September 18, 2006 decision and the

Court's September 25, 2006 decision each addressed the BIA's revelation that it had found numerous additional responsive documents.

### b.       The Second Langan Declaration:  December 1, 2006

On December 1, 2006, Ms. Langan submitted a second declaration in which she explained why the BIA had failed to locate all documents relevant to the NN request.  Ms. Langan explained that once she received the July 11, 2005 request, she distributed it to a number of BIA directors and chiefs, requesting responses, and their responses generated the BIA's August 5, 2005 response.  *Second Langan Decl.* at 3-4.  Once the DOI ordered a more complete response, she expanded the scope of documents sought.  *Id.* at 4-5.  She stated that when the directors and chiefs expanded the description of the document search (for example, from "Quoddy Bay or Passamaquoddy LNG Lease" to "Appraisal of Fair Annual Rental-Eastern Band of Cherokee Indians"), the search expanded the set of responsive documents.  *Id.* at 6.

In its motion for summary judgment dated December 1, 2006, the BIA said that in addition to modifying the nature of the search, from October 6, 2005 to October 25, 2005, the Regional Realty Officer and the FOIA coordinator actually "conducted a manual search of paper files belonging to the Real Estate Services Branch" and the Regional Director, Deputy Regional Director, and the Chief of the Natural Resources Branch "conducted additional searches of their paper files and emails."  *Defs.' Mot. for Summ. J.* at 17 (Docket # 49).  Further, once NN filed its May 12, 2006 FOIA request, the same individuals "searched again."  *Id.*

### c.       The BIA's Oral Representation:  May 24, 2007

On May 24, 2007, when oral argument was held on the December cross-motions for summary judgment, counsel for the BIA admitted that they "made a mistake" in the document search.  *May 24, 2007 Mot. Hearing Tr.* 34:20-22 (Docket # 80) (stating that "the reason for it,

Your Honor, as best I can determine, human error on the BIA.  We made a mistake.  It wasn't deliberate or in bad faith.").  But, he repeatedly assured the Court that the BIA had identified all responsive documents; for example:

> Court:  You're not saying that there are doc - - you think there are documents out there now that they haven't produced, are you?
>
> BIA Counsel:  Well, no, exactly.
>
> NN Counsel:  It is possible, your Honor.
>
> BIA Counsel:  I'm not saying - - I'm - - exactly, I am not saying that.  I'm saying, they've done their search, and there's no reason to suppose that the search was not adequate under the law or that there's further documents floating around out there that we have not produced.
>
> Court:  Right.
>
> BIA Counsel:  So I am saying I don't think there are.

*Id.* 40:17-25; 41:1-3.  The Court made it clear that it was relying on the BIA's representations that the BIA had unearthed all responsive documents.  *Id.* 43:17-20 (stating "let's assume for the moment I find that, based on the record before me, you've turned over, at last, all the documents, as you've represented that you believe is the case").  On June 22, 2007, the Court issued its second decision on NN's FOIA requests, premised on the assumption that the BIA had by then identified all responsive documents, concluding that the BIA's document search comported with the *Maynard* mandate of a reasonable search.  *NNII*, 493 F. Supp. 2d at 111-14.

>           **d.      The BIA's December 13, 2007 Filing and April 2008 Disclosure**

Following the Court's June 22, 2007 decision, the BIA has filed documents revealing the existence of thirty-six documents.[9]  According to NN, on December 13, 2007, the BIA revealed the existence of another batch of five previously unidentified documents when it filed the administrative record and privilege log in the companion case.  *Pl.'s Rule 60(b) Mot.* at 4-6.  NN did not catch the fact that new documents had been released until February 2008, when it was preparing a motion in the companion case.  *Id.* Attach. 6 at 3.  Then, according to NN, in April 2008, the BIA released this batch of five documents in April 2008.  *Pl.'s Req.* at 6.  By letter dated June 25, 2008, BIA Senior Attorney Robin Friedman made a passing reference to the December revelation and April disclosure.  *Status Report* Attach. 1 at 1 (Docket # 86) (stating that "[t]he BIA had not accounted for these five documents in the FOIA litigation") (*Status Report*).

### e.       The June 25, 2008 Status Report

On June 25, 2008, the BIA supplemented its FOIA response by serving NN with a supplemental FOIA production and on June 27, 2008 by filing a status report with the Court. The BIA revealed and disclosed sixteen documents (72 pages).  *Id.* at 2-3.  BIA counsel explained that it had discovered these additional documents when it performed a records search on April 2-3, 2008 in the Knoxville Field Solicitor's Office.  *Id.* at 1.  BIA counsel wrote that "[s]ome of these documents may have already been provided to you in slightly different forms," but it is unclear how many of the June 27 documents were newly disclosed.  *Id*. at 2.

### f.       The April 17, 2009 Status Report

On April 17, 2009, the BIA filed a Second Status Report, noting that on March 19, 2009, Attorney General Holder issued a memorandum encouraging federal agencies to make

---

[9] As noted earlier, there is no document scorecard in this case, and the Court cannot know the extent to which these thirty-six documents duplicate what the BIA previously identified.

discretionary disclosures of information otherwise protected by FOIA. *Second Status Report* (Docket # 99). The BIA made a discretionary release of ten documents previously identified, but withheld from disclosure. *Id.* at 1.

### D.   A Vexing Problem

As the chronology of intermittent disclosure reveals, over the last four years the BIA has sporadically released additional documents responsive to NN's July 11, 2005 FOIA request, and has periodically represented by sworn declaration and attorney representation that all responsive records have been accounted for. Yet, each time, the BIA later discovered a cache of responsive documents somewhere else within the agency, and it has been required to make supplemental disclosures, each time with the implicit and sometime explicit representation that this time its response fully complied with the law. While noting a "troubling history of dribbling disclosure" in June, 2007, the Court accepted the BIA's explanations that the "causes [were] not related to an absence of good faith on the part of the BIA, but instead [were] related to the more mundane workings of its search function and its choice of search phrases." *NNII*, 493 F. Supp. 2d at 110, 113-14. Despite the Court's hortatory language, the BIA's subsequent actions, periodically disclosing more and more responsive documents, is perplexing.

### 1.   The BIA's Legal Positions

Despite NN's skepticism, the Court has no difficulty absolving the BIA from the non-disclosure positions it asserted on specific identified documents, but later waived. The Court reviewed the BIA's filings and its prior orders, and does not conclude that the BIA took legal positions in bad faith to frustrate the disclosure obligations imposed by FOIA. For example, the BIA's decision to disclose the Solicitor's Opinion letter does not mean it acted in bad faith when it asserted its original position that the letter was exempt, and the Court has upheld the BIA's

consistent position not to disclose the Trickey memorandum. *NNVI,* at *13. Similarly, the Court does not hold against the BIA its attempt to comply with the Attorney General's March 19, 2009 directive by disclosing earlier withheld documents. Finally, although the BIA's change in position on the finality of the June 1, 2005 lease approval has never been satisfactorily explained, the Court views the impact on the pending FOIA litigation as incidental to the BIA's substantive legal position on the companion case. In short, to the extent the BIA's delays in disclosure were the result of reconsideration of earlier held legal positions, the Court does not conclude that the BIA's positions evidence a violation of the *Maynard* standard or a "pattern and practice" of non-compliance.

## 2. The BIA's Dribbling Disclosure

Apart from the legal positions the BIA has taken, the BIA's history of dribbling document disclosure in this case of the documents it acknowledges should have been disclosed all along is another matter. Over the four year course of this case, the BIA extended various explanations for why its identification of responsive documents has been so persistently incomplete. The explanations have included: 1) a failure to use the correct search terms, *Second Langan Decl.* at 6; 2) a focus on numbered, not more general unnumbered requests, *id.* at 4-5; 3) human error, *May 24, 2007 Mot. Hearing Tr.* 34:20-22; 4) a failure to look in the correct district offices; and, 5) undetermined causes. *Status Report*; *Jt. Decl. of Courtney W. Shea & Michael T. Riley* Attach. 2 (Docket # 86) (*Jt. Decl.*). The BIA's persistent failure to make a thorough records search was in the face of repeated FOIA notices from NN, appellate directives from DOI, a pending federal lawsuit, Court decisions expressing disquiet, and appeals to the First Circuit. *See NNI*, 453 F. Supp. 2d at 202 (stating that "NN has produced evidence that BIA repeatedly misinformed NN regarding the extent of documents responsive to its FOIA requests"); *NNII*, 493

F. Supp. 2d at 110 (describing the BIA's FOIA responses as a "troubling history of dribbling disclosure").   But, the plain fact is that the BIA was still making disclosures of responsive documents years after the statutory response time had lapsed.

### E.    Conclusions

The Court concludes that the BIA failed to demonstrate that it complied with the *Maynard* standards by failing to show that it has "conducted a search reasonably calculated to uncover all relevant documents."   *Weisberg*, 745 F.2d at 1485 (quotation marks omitted); *Maynard*, 986 F.2d at 559.   The Court observes that unlike the BIA's earlier response to NN's challenge of the reasonableness of its search, the BIA did not present the Court with *Maynard* affidavits.   5 U.S.C. § 552(a)(4)(B) (providing that the "burden is on the agency to sustain its action"); *Maynard*, 986 F.2d at 559; *NNII*, 493 F. Supp. 2d at 109-10.   In fact, the BIA elected not to respond at all.   Further, although the BIA is a large agency with multiple regional offices, to take not days, weeks, or months, but years to identify and disclose responsive documents on its face violates FOIA's twenty day response provision.   5 U.S.C. § 552(a)(6)(A)(i).

Here, the BIA faced an unusually knowledgeable and persistent FOIA requester.   The BIA's initial set of responses effectively told NN that but for a smattering of exempt documents, it had all the relevant documents and there were no more.   In fact, throughout the litigation, the BIA continually reassured NN and the Court that its latest document disclosure was complete.   In response, the ENRLC at Vermont Law School did not simply fold its tent and decamp from the field of battle.   Instead, it pressed on through administrative appeals, through the filing of a federal lawsuit, through repetitive motions, and through federal court appeals.   What troubles the Court is whether similarly grudging and erroneous BIA responses to less well represented and

determined requesters would end the inquiry, subverting congressional intent behind FOIA of full agency disclosure.

Further, the larger context of this case includes its companion action, where NN had filed a tendentious companion lawsuit against the BIA, and this action, where NN was demanding its statutory right to agency documents in connection with its prosecution of its underlying cause of action.  The irony is that the BIA's lack of prompt and complete response to the FOIA requests has meant that the FOIA litigation actually outlasted the underlying lawsuits.  *See Nulankeyutmonen Nkihtaqmikon v. Impson*, No. 08-2122, 2009 U.S. App. LEXIS 23714 (1st Cir. Oct. 28, 2009).  If all along the BIA possessed documents relevant to the underlying litigation, its delay in fully responding to the FOIA requests denied NN access to them when they could have been useful.

To delay access to relevant agency documents until after the disposition of a controversial action against the agency could constitute an effective if questionable litigation tactic.  But, the Court does not find that the BIA coordinated its defense of the separate lawsuits to delay disclosure in the FOIA litigation in order to achieve victory in the more substantive one. If the BIA had done so, it would not have changed its position on the finality of the June 1, 2005 lease approval, thereby rendering most of the post-June 1, 2005 documents subject to disclosure, and furthermore, NN has made no allegation that any of the belatedly disclosed documents contained a smoking gun, establishing the BIA's liability in the underlying claim.  Finally, when it filed the administrative record in the underlying litigation, the BIA disclosed the existence of documents it should have, but had not disclosed in the FOIA litigation, which suggests a lack of a common strategy.  All these actions suggest a distinct lack of coordination in the BIA defense of the two lawsuits.

The unedifying history of this case raises the suspicion that throughout the litigation, the BIA actually knew there were more documents, but consciously represented there were none in an effort to end the inquiry.  The Court suspects this was not the BIA's plan.  It is true that periodically throughout this litigation, BIA employees, including its attorneys, represented to the Court that the BIA had done a complete search for responsive documents, only later to reveal the existence of substantial caches of relevant documents, but the Court is convinced that the BIA employees and lawyers honestly believed what they said, when they said it.  To conclude otherwise would present the unnerving specter of an agency-wide conspiracy to stonewall NN, an impression contradicted by its later voluntary revelations of newly-discovered documents.

Although there is little direct evidence, the Court surmises that the root of the BIA's disclosure problems is simply agency-wide disorganization.  The BIA is, after all, a sprawling federal bureaucracy with thousands of employees and multiple areas of responsibility, and it must constantly generate untold volumes of FOIA-susceptible records.  To respond accurately and promptly to a FOIA request, the agency must have a systematic means of discovering the existence of relevant documents, reviewing them, and disseminating them.  What this case has laid bare is that the BIA's internal procedure for the first step in this process - identifying responsive documents - is significantly flawed.

### F.        Pattern and Practice

NN continues to press the Court to find that the BIA's handling of this case represents a "pattern and practice" of non-compliance with FOIA, to issue a judgment declaring this conclusion, and to order the BIA to "amend its FOIA handbooks, guidance documents, policies, and procedures to ensure complete and timely compliance with FOIA in the future."  *Pl.'s Req.* at 18-21.  Whether a court is authorized to make a pattern or practice determination under FOIA

is unsettled.  *Compare U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 n.12 (1989) (stating that "[e]ven when an agency does not deny a FOIA request outright, the requesting party may still be able to claim 'improper' withholding by alleging that the agency has responded in an inadequate manner"), *Liverman v. Office of the Inspector Gen.*, 139 Fed. Appx. 942, 944 (10th Cir. 2005), *Mayock v. Nelson*, 938 F.2d 1006, 1008 (9th Cir. 1991), *Payne Enterprises., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), *Gilmore*, 33 F. Supp. 2d at 1188, *with Pietrangelo v. U.S. Army*, No. 07-3124-cv, 2009 U.S. App. LEXIS 11983, at *3-4 (2nd Cir. 2009) (stating that "[t]his Court has not yet recognized or articulated the relevant inquiry to a pattern or practice claim in the FOIA context").

Assuming the Court is authorized to issue a declaratory judgment condemning the BIA's pattern or practice of FOIA non-compliance, the evidence here does not warrant such a conclusion.  The BIA's delays in the disclosure of FOIA-susceptible documents in response to NN's multiple requests reflect an unsettling haphazardness about the BIA's pattern and practices in other cases.  But, to draw general conclusions about the BIA's agency-wide patterns and practices from its handling of one case is a step too far.  Furthermore, as the record contains no evidence about the BIA's FOIA handbooks, guidance documents, policies or procedures, the Court will not order the BIA to amend documents it has never reviewed.  The Court concludes that NN failed to prove its "pattern and practice" claim.[10]

---

[10] Despite this conclusion, the Court urges the BIA to revisit its current procedure for responding to FOIA requests to ensure speedy and accurate compliance with the law.  Suzanne Langan, the BIA's FOIA Coordinator at the Eastern Regional Office, explained in detail the procedure she followed upon receiving NN's FOIA requests in 2005, dispersing paper copies of the requests to relevant chiefs and directors.  *Second Langan Decl.* at 2-3.  For unknown reasons, this procedure did not identify all responsive documents.  As late as April 2008, nearly three years after the FOIA requests, the DOI sent two attorneys to Knoxville to investigate the failure of the BIA to identify responsive documents when the search requests were made in 2005 and 2006.  *Jt. Decl.* Attach. 2.  After conducting two days of interviews and discovering additional responsive documents, the DOI attorneys concluded "[a]fter interviewing the BIA personnel named above, and reviewing the documents, we were unable to determine why certain documents responsive to plaintiff's FOIA requests were not revealed or provided to plaintiff."  *Id.* at 4.  This should be an unacceptable state of affairs.  What the BIA should do is beyond the Court's ken, and the Court

G.     **Remedy**

1.     **Injunctive Relief**

The final question is the appropriate remedy.  Where the agency dribbled out responsive documents over the course of years while making periodic erroneous representations no more documents exist, the conclusion that the agency violated FOIA is virtually compelled, particularly where the agency eschewed its statutory right under 5 U.S.C. § 552(a)(4)(B) to justify its actions.  In *Tax Analysts*, the Supreme Court in a footnote observed that "[e]ven when an agency does not deny a FOIA request outright, the requesting party may still be able to claim 'improper' withholding by alleging that the agency has responded in an inadequate manner.  *Cf.* § 552(a)(6)(C)."  *Tax Analysts*, 492 U.S. at 151 n.12.  Section 552(a)(6)(C) provides that if the agency failed to comply with the applicable time limits, the person making a request shall be deemed to have exhausted his administrative remedies, and that if the agency can show "exceptional circumstances exist and the agency is exercising due diligence in responding to the request," the court may retain jurisdiction and allow the agency additional time.  5 U.S.C. § 552(a)(6)(C).  The Supreme Court's citation of § 552(a)(6)(C) suggests that the failure to comply with the statutory timeline in FOIA, at least absent exceptional circumstances, can constitute a FOIA violation.  *Long*, 693 F.2d at 910; *Info. Network*, 611 F. Supp. 2d at 1183; *Gutierrez*, 409 F. Supp. 2d at 1248; *Gilmore*, 33 F. Supp. 2d at 1188.

Under *Nadeau v. Internal Revenue Serv.*, "[j]urisdiction to grant relief under 5 U.S.C. § 552(a)(4)(B) exists only if there is a 'showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'"  No. 97-1338, 1997 U.S. App. LEXIS 19493, at *2 (1st Cir. Jul. 29, 1997)

---

acknowledges that promptly identifying responsive documents in a decentralized and compartmentalized federal agency is no simple task.  But, it is what the law requires, and to the extent the BIA response in this case is duplicated throughout the agency, the current procedure is not working.  The BIA must do better.  The BIA should take no comfort from this ruling and should not take for granted continuing judicial forbearance against more assertive remedies if its FOIA violations persist.

(quoting *Tax Analysts*, 492 U.S. at 142). By the same token, § 552(a)(4)(B) authorizes the Court "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). The record in this case establishes that the BIA has improperly withheld agency records by substantially delaying their identification and disclosure and the Court is therefore authorized to enjoin "from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.*

At this point, three and a half years after the initial FOIA request, the BIA may well at last have produced all responsive documents, but given the history of this case, the Court agrees with NN that it is entitled to a more formal assurance that the BIA has fully complied with its FOIA obligations. The Court therefore orders the BIA not to withhold any agency records from NN that are subject to disclosure under FOIA based on NN's three FOIA requests, and to file an updated and comprehensive Vaughn index, setting forth the documents it has disclosed, and the documents it claims are exempt from disclosure. In lieu of compliance with this order, the BIA may satisfy its FOIA obligations by the filing of an affidavit or sworn declaration by Hilary Tompkins, Solicitor of the United States Department of the Interior or her designee, confirming that all files that could contain responsive documents have been searched and that no additional documents exist.[11] The Court will not order the BIA to engage in another records search, since by compelling a sworn statement of a senior BIA official attesting to completeness, the Court has placed the burden on the BIA official to assure himself or herself that the statement is true.

---

[11] NN does not specify a position within the BIA it considers a senior official. It is a matter of public record that Hilary Tompkins is the Solicitor for the DOI and has the overall responsibility to represent the Department in federal litigation. The Court authorizes either Solicitor Tompkins to sign the sworn declaration or to designate an official within the DOI to do so. On this point, however, the Court cautions the BIA that renewed representations from officials and attorneys whose prior representations have proven inaccurate are unlikely to meet this requirement.

Regarding the other NN demands for relief, the Court will not venture beyond the specifics of this case and draw unwarranted general conclusions.

### 2.    Attorney's Fees and Costs

Finally, NN demands attorney's fees.  FOIA provides:

> The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

5 U.S.C. § 552(a)(4)(E).[12]  An award of attorney's fees under FOIA "is a matter for the sound discretion of the trial court."  *Aronson v. U.S. Dep't of Housing & Urban Dev.*, 866 F.2d 1, 2 (1st Cir. 1989) (quoting *Education/Instruccion, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 649 F.2d 4, 7 (1st Cir. 1981)).  *Aronson* describes the limitations on district court discretion:

> This discretion, however, is circumscribed by two generally accepted principles. The first is that a plaintiff is not automatically entitled to an award of attorney fees just because he/she succeeds in obtaining the requested information. The second restraint on the district court's discretion is that it must take into consideration four factors in determining whether attorney fees should be awarded under FOIA.  These four factors are:  (1) the benefit to the public, if any, derived from the case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's interest in the records sought; and (4) whether the government's withholding of the records had a reasonable basis in law.

*Id.* at 2-3 (citations and internal punctuation omitted).

First, under *Aronson*, the Court acknowledges that NN is not automatically entitled to an award of attorney's fees in this case simply because it was successful in obtaining requested documents from the BIA.  Next, turning to the public interest factor, NN's FOIA lawsuit has served the public interest by requiring the BIA to assess and reassess its responses to NN's FOIA

---

[12] Section 552(a)(4)(E) was amended as part of the Open Government Act to define "substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(ii).  NN argues that the Open Government Act amendments are applicable to this lawsuit or otherwise retroactive.  *Pl.'s Req.* at 23-25.  The Government has argued that the Open Government Act attorney fee provisions are not retroactive.  *Notice of Supplemental Authority* (Docket # 104).  Because the Court concludes that NN substantially prevailed under the older version of FOIA, it does not reach whether the new provisions of the Open Government Act would apply.

requests, to release documents previously withheld, to find documents previously misplaced or not located, and to defend a confused and inefficient internal FOIA response process.   In addition, NN's FOIA requests concerned documents related to a companion action challenging the BIA's approval of a ground lease necessary for the construction of an LNG terminal on the coast of Maine, a matter of public debate and concern.  The second factor is the commercial benefit to the complainant.  This factor, narrowly construed, has only an attenuated relevance to NN's FOIA requests, since the commercial benefit to NN itself from obtaining these documents and by extension from prosecuting its companion action is derived by blocking the commercial benefit to the Reservation and Quoddy Bay.  The third factor is the nature of NN's interest in the documents it sought.  Here, the BIA documents relating to its approval of the ground lease had a direct impact on NN's position in the lawsuit, and the First Circuit has determined that NN had standing to challenge the BIA's approval.  *NNIII*, 503 F.3d at 26-30.  The fourth factor – whether the BIA's withholding of documents had a reasonable basis in law – is mixed.  The BIA released some withheld documents voluntarily, and to the extent the Court reached the question of whether the BIA's exemption assertions were proper, it upheld some of them, and some were eclipsed by the BIA's change of tactic.  *See NNII*, 493 F. Supp. 2d at 101-08.  Earlier in this opinion, the Court concluded that the BIA's change in position on the finality of the June 1, 2005 lease approval was not related to the FOIA lawsuit.  At the same time, the BIA's multi-year failure to locate responsive documents was not reasonable under the law.   In evaluating all these factors, the Court concludes that NN is entitled to a reasonable attorney's fees and litigation costs under 5 U.S.C. § 552(a)(4)(E).

The Court therefore grants NN's request for authorization to file a petition for recovery of its attorney's fees with the following caveat.  The Court's conclusion is not a carte blanche.  The

Court does not find that NN substantially prevailed on all aspects of this litigation. The Court concludes that NN substantially prevailed to the extent it forced the BIA to unearth undisclosed documents buried within the agency, and the Court will order attorney's fees and costs for that work. To the extent NN seeks attorney's fees and costs for other legal services, the Court expects NN to justify its application by demonstrating that it prevailed in this case on these additional legal services.

## III.    CONCLUSION

The Court GRANTS Nulankeyutmonen Nkihtaqmikon's Request for Relief in part and DENIES it in part (Docket # 100). The Court CONCLUDES that the Bureau of Indian Affairs failed to respond to the Freedom of Information Act requests of Nulankeyutmonen Nkihtaqmikon in accordance with the time limits of the Act and that the Bureau of Indian Affairs failed to make a prompt, effective, and comprehensive search within the agency for responsive documents. The Court ORDERS the Bureau of Indian Affairs within thirty (30) days of the date of this Order not to withhold any agency documents which are subject to disclosure under the Freedom of Information Act and to file a comprehensive Vaughn index, setting forth each document responsive to Nulankeyutmonen Nkihtaqmikon's three pending Freedom of Information Act requests, whether an exemption is being claimed, and if so the basis for each claimed exemption. In lieu of compliance with this portion of the Order, within thirty (30) days of the date of this Order or such further time as may upon motion be allowed, the Bureau of Indian Affairs may submit an affidavit or sworn declaration from Hilary Tompkins, Solicitor of the Department of the Interior, or her designee, affirming that the Bureau of Indian Affairs has performed a comprehensive search within the agency for responsive records to all pending Nulankeyutmonen Nkihtaqmikon Freedom of Information Act requests and that no records exist

that have not been previously identified.    The Court GRANTS Nulankeyutmonen Nkihtaqmikon's request to file a petition for attorney's fees and costs, but only to the extent those services and costs are directly related to matters upon which it substantially prevailed.  In all other respects, the Court DENIES Nulankeyutmonen Nkihtaqmikon's Request for Relief.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 2nd day of December, 2009