UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NULANKEYUTMONEN NKIHTAQMIKON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-05-188-B-W |
| | ) | |
| BUREAU OF INDIAN AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFF'S PETITION FOR ATTORNEY FEES AND COSTS UNDER THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 522(a)(4)(E)**

Presented with an application for attorney fees under 5 U.S.C. § 522(a)(4)(E) for $157,021, the Court awards a fee of $86,885.16, eliminating student billing from the Environmental & Natural Resources Law Clinic (ENRLC) at Vermont Law School, reducing excessive, unexplained, and overstaffed hours, and applying an equitable reduction of 25% to the net figure to account for lack of specificity. At the same time, the Court rejects the Bureau of Indian Affairs' (BIA) argument that no fee should be awarded because it had a reasonable basis for withholding its documents under the Freedom of Information Act (FOIA) and that Nulankeyutmonen Nkihtaqmikon (NN) did not substantially prevail on all the issues for which ENRLC is claiming fees.

# I.     STATEMENT OF FACTS

## A.     The Procedural History

On April 24, 2009, Nulankeyutmonen Nkihtaqmikon (NN) filed a request for relief in which it asked for permission to file a motion for recovery of attorney fees and costs incurred in this Freedom of Information Act, 5 U.S.C. § 552, (FOIA) case. *Pl.'s Req. for Relief* (Docket # 100). The Bureau of Indian Affairs' initial response did not address the attorney fees request. *Resp. to Pl.'s Req. for Relief* (Docket # 102). On November 13, 2009, the Court issued an Order addressing the merits of the other requests for relief but deferring ruling on NN's other requests, including the request for attorney fees and costs. *Order on Pl.'s Req. for Relief* at 5 (Docket # 105). On November 18, 2009, the Court held a telephone conference of counsel to allow BIA to submit a response to NN's request for attorney fees and costs. *Minute Entry* (Docket # 107). The BIA declined to respond. *Id.* On December 2, 2009, the Court issued an Order, granting NN's request to petition for an award of attorney's fees and costs. *Second Order on Pl.'s Req. for Relief* (Docket # 108).

On February 25, 2010, NN filed a motion for award of attorney fees and costs, requesting a total award of $157,021. *Pl.'s Pet. for Attorney Fees and Costs Under the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E)* at 13 (Docket # 116) (*Pl.'s Pet.*). This time the BIA responded; the response was filed on April 2, 2010. *Resp. to Pl.'s Pet. for Fees and Costs* (Docket # 121) (*BIA Resp.*). NN replied on April 16, 2010. *Pl.'s Reply in Support of Pet. for Attorney Fees and Costs Under FOIA* (Docket # 122) (*Pl's Reply*).

### B.     Tortuous Litigation

This case began on June 8, 2005 when NN mailed a FOIA request to BIA, seeking the release of BIA documents relating to its approval of a ground lease between the Passamaquoddy Tribe and Quoddy LLC, which planned to construct an LNG facility on tribal land. The Court has elsewhere described the "tortuous history" of NN's FOIA request, and will not repeat it. *Nulankeyutmonen Nkihtaqmikon*, 672 F. Supp. 2d 154, 156-58 (D. Me. 2009) (*NN*). Over four years later, on December 2, 2009, the Court granted NN's request to file a petition for attorney fees and costs. *Id.* at 172-74.

In response to NN's request for an award of $157,021, the BIA objected to the following: 1) an absence of "detailed contemporaneous" billing records; 2) "unproductive, excessive, or duplicative" efforts; and, 3) the BIA's reasonable basis for withholding the requested documents.[1] *BIA Resp.* 2-8. Finally, it urges the Court to adopt "a more even-handed approach," urging the Court to follow its analysis in *Sullivan v. City of Augusta*, 625 F. Supp. 2d 28 (D. Me. 2009). *Id.* at 8-9.

## II. DISCUSSION

### A. FOIA Litigation and Attorney Fees Awards

FOIA provides:

The court may access against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

---

[1] The BIA accepted NN's assertion that the appropriate hourly billing rate for experienced attorneys is between $250 and $275. *BIA Resp.* at 2.

5 U.S.C. § 552(a)(4)(E).[2]  In its December 2, 2009 Order, the Court addressed the criteria for the issuance of such an award and concluded that NN substantially prevailed on some aspects of the litigation and authorized an award.  *NN*, 672 F. Supp. 2d at 173-74.  What remains is the amount.

"Where fee-shifting under an open-ended statute is at issue, courts typically ascertain reasonable attorneys' fees by means of the lodestar method."  *United States v. One Star Class Sloop Sailboat*, 546 F.3d 26, 37-38 (1st Cir. 2008).  The lodestar method entails "multiplying the number of hours productively spent by a reasonable hourly rate. . . ." *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 335 (1st Cir. 2008).  "Reasonable hourly rates will vary depending on the nature of the work, the locality in which it is performed, the qualifications of the lawyers, and other criteria."  *One Star*, 546 F.3d at 38.  Even after the basic lodestar is calculated, the court "may adjust it, up or down, to reflect other considerations, such as the results obtained."  *Id.* at 38 (citing *Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 337 & n.3 (1st Cir. 1997)).  The First Circuit requires the district court to "make concrete findings, supply a clear explanation of its reasons for the fee award, and most of all, retain a sense of overall proportion."  *United States v. Metropolitan Dist. Com.*, 847 F.2d 12, 16 (1st Cir. 1988) (internal quotations and citation omitted).

## B.     A Reasonable Basis for Withholding

---

[2] The BIA points out that on December 31, 2007, the President signed into law the Open Government Act of 2007, which amended 5 U.S.C. § 552(a)(4)(E) to restore the application of the "catalyst theory" for an award of attorney's fees.  *Supp. Authority Regarding Fee Pet.* at 1-2 (Docket # 125) (quoting 5 U.S.C. § 552(a)(4)(E) (stating that "substantially prevailed" includes "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial")) (*Def.'s Supp. Auth.*).  Neither party claims that this definitional change affects the result.

Citing *Crooker v. United States Parole Comm'n*, 776 F.2d 366 (1st Cir. 1985) and *Kendland Company v. Dep't of the Navy*, 599 F. Supp. 936 (D. Me. 1984), the BIA seeks to excuse its conduct in this case on the ground that it had a reasonable basis for withholding the requested material and therefore NN's motion for attorney fees should be either denied or reduced. *Def.'s Resp.* at 7-9. Although the BIA contends that *Crooker* supports a denial of the BIA request for attorney fees under FOIA, the Court disagrees. *Id.* Critically, the *Crooker* Court stated that "we do not find the government's original withholding of such reports to have been unreasonable." *Crooker*, 776 F.2d at 369.

Here, the BIA's original response to NN's June 9, 2005 FOIA request was that "the only document in the BIA's possession related to the request was the proposed ground lease agreement, which Plaintiff already possessed," a response that in light of the cascade of subsequent released documents was manifestly unreasonable. *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 453 F. Supp. 2d 193, 196 (D. Me. 2006). Further, unlike *Crooker*, the BIA took a position early in the litigation before the district court and as a consequence, generated a favorable ruling. On appeal, the BIA took a contrary position, and as the First Circuit wrote, the BIA's change in position "altered the analysis of whether certain documents at issue are actually 'predecisional' for purposes of the 'decisional process privilege' codified at 5 U.S.C. § 552(b)(5)." *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, No. 07-2290, 2008 U.S. App. LEXIS 27455, at *1 (1st Cir.

June 16, 2008). It is difficult to characterize the BIA's shifting and contradictory rationales as "reasonable."

Finally, as detailed in *NN*, the BIA's response throughout the litigation has been utterly disorganized and seemingly cavalier. The result has been multiple legal and judicial interventions, resulting in seven, now eight written decisions by the First Circuit and this Court. *Id.*; *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 672 F. Supp. 2d 149 (D. Me. 2009); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 601 F. Supp. 2d 337 (D. Me. 2009); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 493 F. Supp. 2d 91 (D. Me. 2007), *stay granted*, No. 07-2290, 2008 U.S. App. LEXIS 27455 (1st Cir. June 16, 2008); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 453 F. Supp. 2d 193 (D. Me. 2006); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 450 F. Supp. 2d 113 (D. Me. 2006). Here, unlike *Crooker*, the Court expressly finds that the BIA's "withholding of such reports to have been unreasonable."[3] *Crooker*, 776 F.2d at 369. *Crooker* does not assist the BIA, and the Court is mildly surprised at the BIA's contention in view of the unedifying history of this FOIA litigation.

*Kendland* is inapposite for a number of reasons. In *Kendland*, a subcontractor to a Navy contract was seeking Navy documents "in order to prosecute a claim for damages and additional compensation against [the general contractor]." *Id.* at 937. The plaintiff filed a FOIA request on July 22, 1983, but the

---

[3] The Court upheld the BIA's later position on the Trickey and Keel memoranda, but NN represents that it has excluded work on those issues from its bill. *Pl.'s Reply* at 2 (stating that "NN has had no difficulty redacting its hours and reducing its attorney fee request to account for this discrete ruling in BIA's favor").

Navy failed to fully comply, leading the plaintiff to file a FOIA Complaint on December 7, 1983. *Id.* "All of the requested documents were produced voluntarily by the Navy on June 1, 1984, and June 15, 1984." *Id.* The Plaintiff moved to dismiss the FOIA action and the Court dismissed the case on June 17, 1984. *Id.*

In *Kendland*, the district court concluded that the FOIA lawsuit had caused the release of the requested documents, or at least had hastened their release, and satisfied the first prong for an attorney fees award. *Id.* at 938 (noting that the agency had not demonstrated that the disclosure "was due more to its responsible compliance with the provisions of the Act than to the complainant's pending suit"). However, the court declined to issue an attorney fees award under the second prong of § 552(a)(4)(E) because the plaintiff sought the information "solely for use in private litigation concerning Kendland's business interests. As such, the information is to be used only for Kendland's individual, pecuniary benefit." *Id.* at 939.

Unlike *Kendland*, there has been no claim that NN's underlying law suit was for its individual pecuniary benefit. In the Complaint in the underlying action, NN did not demand a monetary award (other than attorney fees if it prevailed); it sought injunctive relief in order to avoid having Split Rock, the site of the proposed LNG terminal, being transformed "from a natural beach area with historical, cultural, religious, and recreational significance, to an industrial zone that will not be accessible to the members of the group." *Nulankeyutmonen Nkihtaqmikon v. Impson*, Civil Action No. 05-168-B-W, *Compl.* ¶¶ 5, 129-132 (Docket # 1). Thus,

there is no basis under *Kendland* to conclude that NN should not be allowed to collect its attorney fees under § 552(a)(4)(E) because "an award of attorney's fees is unnecessary to advance the policies of the Act." *Kendland*, 599 F. Supp. at 939.

The Court does not agree that the BIA had a "reasonable basis for withholding" under either *Crooker* or *Kendland.*[4]

## C.    "Substantially Prevailed"

A prerequisite for an attorney fees award under 5 U.S.C. § 552(a)(4)(E) is that the party must have "substantially prevailed."  In general, NN substantially prevailed in this FOIA case and to the extent it did not, NN has excised the fees attributable to the unsuccessful parts of its case: with one exception.

While the FOIA case was pending on appeal, the BIA changed its position regarding the finality of its approval of the gas lease and this change of position had a direct impact on the FOIA litigation.  *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, No. 07-2290, 2008 U.S. App. LEXIS 27455 (1st Cir. June 16, 2008); *NN*, 672 F. Supp. 2d 154 (D. Me. 2009); *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 601 F. Supp. 2d 337 (D. Me. 2009).  NN moved the First Circuit to impose sanctions.  The First Circuit denied its motion "without prejudice to a later refiling or renewal." *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 2008 U.S. App. LEXIS 27455, at *2.  There is no suggestion that the motion

---

[4] The BIA draws comfort from language in *Kendland* to the effect that an attorney's fee should not be awarded under § 552(a)(4)(E) if the information "was improperly withheld due to bureaucratic ineptitude or some other undiscernible reason." *Kendland*, 599 F. Supp. at 939.  The Court has never satisfactorily understood why the BIA did not comply with the FOIA statute in this case.  Though bureaucratic ineptitude may have played a role in the BIA's mishandling of this case, it could explain the BIA's entire performance.  In any event, the Court does not read *Kendland* to create a blanket "bureaucratic ineptitude" or "undiscernible reason" exception from FOIA's fee-shifting provision, which could create a perverse incentive.

was ever refiled, renewed, or granted, and therefore, NN cannot be said to have prevailed on that aspect of the litigation.

The NN bill contains three attorney billing entries regarding the motion for sanctions:

> 3/13/2008 Teresa Clemmer 5.20 Review of J. McCave research; begin drafting Motion re sanctions in FOIA appeal $225.00 50.00% $585.00;

> 3/14/2008 Teresa Clemmer 15.10 Finish drafting Motion re sanctions; revise and finalize Motion re supplementation of record on appeal; file and serve both motions $225.00 50.00% $1,698.75;

> 3/14/2008 David Mears 1.50 Review and comment on motions to supplement record and for sanctions $250.00 50% $187.50.

*Pl.'s Pet.*, Attach. 3, *Attorney Spreadsheet* at 4, 5 (*Attorney Spreadsheet*).

The Court acknowledges that the time claimed by Attorneys Clemmer and Mears included attention to the motion to supplement as well as the motion for sanctions and it appears that the First Circuit granted the motion to supplement. *Nulankeyutmonen Nkihtaqmikon*, 2008 U.S. App. LEXIS 27455, at *2. However, as best the Court can determine, the motion to supplement addressed the inclusion of four additional exhibits.[5] Although Attorneys Clemmer and Mears reduced these

---

[5] This issue is an example of why the Court was concerned about whether absent express direction from the First Circuit, it has authority to issue an attorney fees award for appellate work. On June 28, 2010, citing First Circuit Local Rule 39.1(b), the Court ordered the parties to submit memoranda on the issue. *Order* (Docket # 123). The parties complied and disagreed. *Def.'s Supp. Auth.*; *Pl.'s Supp. Brief in Support of Pet. for Atty. Fees and Costs Under FOIA* (Docket # 126) (*Pl.'s Supp. Brief*). Acknowledging the question is "far from clear," the BIA states that the "limited available authorities suggest that the District Court lacks authority to award fees for time spent at the appellate level." *Def.'s Supp. Auth.* at 6. The BIA contends that NN could have filed a motion for award of appellate fees within 30 days of April 1, 2009, the date the First Circuit entered Judgment and remanded the case to the district court. *Id.* at 7. Despite the First Circuit's Judgment, NN contends that its April 1, 2009 ruling was not "a final judgment because the First Circuit made no determination on the merits with respect to any of NN's claims." *Pl.'s Supp. Brief* at 2.

The Court remains uncertain. There is little doubt that under the First Circuit rule, if the appellate court directed the district court to resolve any petition for attorney fees and costs, the trial

charges by one-half, the Court is skeptical that a motion to supplement the record on appeal could have been as difficult and time consuming as a motion demanding the imposition of sanctions against a governmental agency. For example, Ms. Clemmer's March 13, 2008 time entry makes no mention of the motion to supplement. The Court reduces each charge a further 25% to reflect the portion of the legal effort upon which NN was successful. The result is that the Court approves $292.50 for Ms. Clemmer on March 13, 2008, $849.37 for Ms. Clemmer on March 14, 2008, and $93.75 for Mr. Mears on March 14, 2008.

### D. Student Billing

NN's bill lists seventeen student clinicians, totals the number of claimed hours for ten of those students at 379.43, and bills them at a rate of $90 per hour. *Pl.'s Pet.*, Attach. 4, *Student Spreadsheet* (*Student Spreadsheet*). The BIA objects to paying for "more of a law school learning-opportunity rather than an economically efficient litigation effort." *BIA Resp.* at 1. NN justifies its inclusion of student billing by observing that the Supreme Court affirmed an award allowing recovery of

---

court would be authorized to do so, and most of the case law NN cites addresses instances in which circuit courts directed district courts to address the issue. Further, NN's argument that there was no final judgment within the meaning of Local Rule 39.1(b) seems to contradict the First Circuit's April 1, 2009 mandate, which is headed "Judgment." *J.* (Docket # 97). Retaining the authority to resolve appellate attorney fees at the appellate court is certainly practical since as this Court noted, the district court is often in a poor position to evaluate what happened at the circuit court. *Order* at 2 (Docket # 123).

Here, for the purely practical reasons, the Court has addressed NN's request for attorney fees for appellate work. First, the appellate work in this case is fairly confined. Second, this Court has a basic understanding about what happened on appeal – what was argued, what was won and what was lost. Third, to deny NN attorney fees at this point for failing to comply with First Circuit Local Rule 39.1(b) could mean that NN is deprived of any attorney fees for the successful portion of its appeal, a result that seems contrary to FOIA's fee shifting directive. Fourth, the BIA has not specifically objected to NN's itemization of appellate work.

law clerk billing. *Pl.'s Pet.* at 11 (citing *Missouri v. Jenkins*, 491 U.S. 274, 284 n.7 (1989); *City of Riverside v. Rivera*, 477 U.S. 561, 565 (1983)).

Although of some assistance, *Missouri* and *Riverside* addressed respectively whether 42 U.S.C. § 1988 authorizes an award for paralegal work and for a law firm's law clerks; neither case directly addressed whether 5 U.S.C. § 552(a)(4)(E) authorizes an award for law student work in a clinic context.[6] *Missouri*, 491 U.S. 284 n.7 (describing the positions the courts of appeals have taken on separate billing of paralegal time); *Riverside*, 477 U.S. at 565 (stating that the attorney's fees award included "84.5 hours expended by law clerks at a rate of $25 per hour").[7]

The case that directly addresses whether a prevailing party in FOIA litigation should be compensated for "supervised law-students' work on the case in a clinic" is *Jordan v. Dep't of Justice*, a District of Columbia Circuit Court of Appeals decision. 691 F.2d 514, 522 (D.C. Cir. 1982). In *Jordan*, a student at Georgetown University Law Center filed a FOIA request for "all charging manuals, rules and

---

[6] In the analogous matter of paralegals, the First Circuit placed its imprimatur on the use of paralegals and on separate billing for their services. *Lipsett v. Blanco*, 975 F.2d 934, 939 (1st Cir. 1994) (stating that "courts generally allow hours reasonably and productively expended by paralegals in civil rights litigation to be compensated at market rates when constructing fee awards"); *Jacobs v. Mancuso*, 825 F.2d 559, 563 (1st Cir. 1987) (stating that "the use of such personnel is to be encouraged by separate compensation in order to reduce the time of more expensive counsel").

[7] NN cites *DiGennaro v. Bowen*, 666 F. Supp. 426, 431 (E.D.N.Y. 1987) for the proposition that "courts have awarded fees for students in law school clinics under federal fee-shifting statutes." *Pl.'s Pet.* at 12. Again, although *DiGennaro* is somewhat helpful, the district court was addressing a motion for award of fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and, more specifically, the law students were "working pursuant to the Student Practice Rule of the Eastern District, under appointment by this court from the *pro bono* panel," a situation that differs in some important respects from the instant case. *Id.* at 432. Another case NN cites, *Absher Constr. Co. v. Kent Sch. Dist.*, 917 P.2d 1086 (Wash. Ct. App. 1995), addressed a state fee-shifting statute. A third case, *Taylor v. Chubb Group Ins.*, 1997 OK 47, 874 P.2d 806, addressed a state fee-shifting statute and paralegal, not law student work. The BIA, though complaining about an award for the work of law students, cited no case law.

guidelines setting forth standards for the exercise of prosecutorial discretion in criminal matters." *Id.* at 515. The Department of Justice refused the request and FOIA litigation ensued; the plaintiff ultimately prevailed. *Id.* After his success in the underlying litigation, the plaintiff sought an award of attorney fees and included 420 hours of work by the legal staff of the Institute for Public Representation at Georgetown, including time spent by four student interns at $15 per hour. *Id.* The district court denied the award for law student time, citing four grounds: 1) law students are not authorized to practice; 2) the Federal Government has not waived sovereign immunity with respect to awards of fees to law students; 3) the students were not paid any compensation by the clinic; and, 4) calculation of student-generated fees is inherently problematic. *Id.* at 522.

Rejecting each reason, the Circuit Court reversed. *Id.* at 524. Acknowledging that the unauthorized practice of law argument has a "superficial vitality," the Circuit Court noted the "commonplace use of law students by law firms" and a "tide of state statutes and court rules authorizing law students, under appropriate circumstances, to undertake functions of licensed attorneys." *Id.* at 522. The *Jordan* Court concluded that the sovereign immunity issue "begs the very question at issue. If student work is within the compass of a statutory provision authorizing allowance of attorneys' fees, then passage of the statutes relinquished sovereign immunity; if student work cannot be factored into an attorneys' fee award under such a statute, the portion of the claim predicated upon that work fails, irrespective of sovereign immunity, because there is no basis for assessing a fee therefor against

a litigant." *Id.* at 523. It concluded that the term "attorneys' fees" in the FOIA "fee-award provision is broad enough to include law-student services." *Id.* (footnote excluded). It rejected the third argument – that no fee should be awarded because no compensation was paid – on the ground that "fee allowances are basically to be measured by the market value of the services rendered, not the amount actually received by the attorney nor the amount that would have been received absent an award of fees." *Id.* at 523-24 (footnote omitted). Finally, the Circuit Court addressed that proposition that "duplication of effort and time wasted on unfruitful work necessarily occur in a law-school clinic, with its periodically changing student population and its by-definition inexperienced workers." *Id.* at 524. The appellate Court perceived "no need to call for proof of that assertion," but concluded that protests about the problem of unproductive work is not unique to law students in a clinical setting and does not represent "an insurmountable obstacle to reasonable fee awards." *Id.*

In sum, the *Jordan* Court discerned "no reason why FOIA's statutory authorization of attorneys' fee awards should not encompass student work in law school clinics." *Id.* at 524. Citing *Jordan*, at least one district court in the First Circuit followed suit. *Family Housing & Law Clinic v. Heckler*, 602 F. Supp. 767, 771 n.9 (D.N.H. 1985) (stating that the "law is clear that law students are not to be denied requests for fees merely because of their status"). The Court concludes that law students who while working under the supervision of a clinic attorney

contributed to the prosecution of this FOIA case may be eligible for an award of attorney's fees under 5 U.S.C. § 552(a)(4)(E).

Eligible does not mean entitled. To bill for the law student hours in a clinical setting poses inherent questions of reasonableness. Unlike a law clerk in a law firm, which must justify its bills to its clients, there is no similar economic restraint for law student research in a law school clinical setting. The dampening influence of a cost-conscious client, the prospect of losing an overcharged client to a competitor, and the top-down drive for efficiency are not present in a law school clinic. To the contrary, the more law students research, the more they learn, which is why they are there to begin with. These problems, as the *Jordan* Court observed, are not insurmountable, but they place an enhanced burden on the clinic to justify bills for law student work, to describe the work with specificity, to relate the necessity of the work to the legal matter at issue, to demonstrate close supervision by the responsible attorney, to describe the nature of the clinical program – participation requirements, whether the students are graded and on what criteria, mandatory hours of research, and other details - and to explain the level of expertise for each law student – the student's grade level and any special proficiency.

NN's bill lists a total of seventeen law students who worked on the FOIA case; NN submitted bills for ten of those students. NN has described the Clinic:

> The Environmental & Natural Resources Law Clinic functions as a law firm within an academic setting. The bulk of the legal work is conducted by student clinicians (second- and third- year law students) and law fellows (staff attorneys with 1-6 years of experience who work

part-time in the Clinic while pursuing their LLM degrees). Because the student clinicians have virtually no litigation experience and because the law fellows are relatively junior attorneys, both groups require ongoing supervision from the more experienced faculty at the Clinic. In the present case, supervision accounts for only 109 hours (10 percent) of the hours claimed, while junior attorney and student clinician work accounts for 941 hours (90 percent). This is consistent with the division of labor at most law firms, which rely on law clerks and junior associates for the majority of the day-to-day work involved in litigation, with higher level supervision provided by senior associates and partners. Even though this approach involves some duplication due to the need for oversight, it is generally cost-effective because a much lower hourly rate can be charged for less experienced law clerks and associates.

. . .

Each year, three groups of student clinicians work in the Clinic, one group during the fall semester, one group during the spring semester, and one group during the summer. The law fellows generally work at the Clinic for a one- or two-year term. Since the commencement of this case in the fall of 2005, a total of fourteen semesters have passed, meaning fourteen groups of student clinicians have worked in the Clinic, as well as three law fellows. NN is seeking reimbursement for just ten students who have worked on this matter, i.e., an average of less than one student (0.71) per semester, as well as the two law fellows who devoted substantial time to this litigation.

*Pl.'s Reply* at 4-5 (footnotes omitted).

Although NN's Reply provides some general information, the description does not say which of two students were fellows as opposed to student clinicians, the students' grade levels, the criteria NN used to determine whether to charge for a student's work, what level of oversight the Clinic attorneys provided the students, whether the students were graded, and if so whether by quality, by hours, or by some combination.

Further, the students' description of their legal services is far too general to evaluate the reasonableness of their work product. Here, for example, NN is submitting a bill 173 hours that a student named Steven Carroll spent working between May 25, 2006 and June 29, 2006 on "FOIA summary judgment response," "FOIA research,"[8] "[m]emo – response to motion for summary judgment" or "[b]rief – response to motion for summary judgment." *Student Spreadsheet* at 2. As it turned out, NN's response to the motion for summary judgment consisted of a nineteen page memorandum, a response to five BIA statements of material fact, and the assertion of twelve additional statements of material fact. *See Pl.'s Resp. to Defs.' Mot. for Summ. J.* (Docket # 14); *Pl.'s Opposing Statement of Material Facts* (Docket # 15).

If it were apparent, as NN asserts, that the expenditure of such an extraordinary amount of student time resulted in less time for the responsible attorneys, the Court would be more receptive to NN's argument that reimbursing the student time was more cost effective. But, here, Mr. Parenteau spent 5 hours on the responsive memorandum, Mr. Kolher spent 104 hours, and Mr. Mears spent 4.5 hours for a total amount of attorney time of 113.5 hours. *See Attorney Spreadsheet* at 1-2. Combining attorney and student time, the NN bill documents

---

[8] This reference includes five items: 1) 5/26/2006: 5.50 FOIA research, email to Justin; 2) 5/302006: 6.50 FOIA research, summary judgment response; 3) 5/31/2006: 6.50 FOIA research, meeting, background reading; 4) 6/1/ 2006: 7.00 FOIA research; and, 5) 6/2/2006: 5.25 FOIA research. *Student Spreadsheet* at 2.

the expenditure of 286.5 hours of billed time to compile a relatively brief responsive memorandum and an even briefer statement of material facts.[9]

A similar detailed analysis of NN's billing submissions demonstrates that the amount of claimed attorney time is more than sufficient to research, write, and argue the various motions in this case without the additional expenditure of clinician time. The Court concludes that the student work is superfluous and, to the extent it is not, NN has not provided the Court with sufficiently detailed justification to require the BIA to reimburse student clinical work. Although the Court could allow NN's request for student legal fees, it will not do so on this showing, and the Court deducts the $34,149.00 in student clinician fees from NN's fee application.

## E.    "Unproductive, Excessive, or Duplicative" Efforts

### 1.    Overstaffing

The BIA objects to what it characterizes as a "strike force" of lawyers. *BIA Resp.* at 5 (quoting *Williams v. Poulos*, No. 94-3057, 1995 U.S. App. LEXIS 10667, at *17 (1st Cir. May 12, 1995)). The BIA's main disgruntlement was the 17 student clinicians, whose names appear on the NN bill, and more narrowly the 10 students clinicians whose time NN billed. *Id.* at 5. The Court's conclusion that NN has failed to demonstrate the reasonableness of the student clinicians' billing obviates the BIA's student clinician argument.

---

[9] NN's response consisted of five and one-half pages reciting facts and one and one-half pages describing the standard of review, leaving only nine and one-half pages of substantive legal argument. Further, whether the BIA was required to turn over documents under FOIA was, as federal civil cases go, not inordinately complex or esoteric. The Court cannot begin to fathom how NN's legal team could have spent nearly 300 hours to do this work.

The BIA also complains about the five attorneys involved in the case for NN, saying that "Plaintiff could easily have handled this case with the equivalent one "Partner" and one "Associate." *Id.* Once the bill has been pared by eliminating the numerous student clinicians, the number of attorneys is not as susceptible to the charge of overstaffing. However, even though NN contends that its billing practices follow a law firm model, it is difficult to neatly categorize the clinic lawyers with the traditional senior partner, partner, junior partner, senior associate, junior associate law firm pyramid, nor does it seem necessary for a law school clinic, which is not a law firm, to precisely follow a law firm model. What is more significant is what the bill reveals about the respective roles of each attorney so that the Court can determine whether the charges are reasonable.

Here, David Mears describes himself as the "current director of the Environmental and Natural Resources Law Clinic ("ENRLC") and a professor of law at Vermont Law School." *Pl.'s Reply*, Attach. 1, *Decl. of David K. Mears, Esq.* ¶ 1 (*Mears Decl.*). He says that he was "a supervising attorney in this matter from 2005 through the present." *Id.* ¶ 2. Mr. Mears' bill starts on November 28, 2005 and stops on July 16, 2008. *Attorney Spreadsheet* at 4. He is billing at an hourly rate of $250.00. *Pl.'s Pet.*, Attach. 1, *First Decl. of Teresa Clemmer* ¶ 8 (*First Clemmer Decl.*).

Mr. Parenteau describes himself as the "former director of the [ENRLC] and a professor of law at Vermont Law School." *Pl.'s Reply*, Attach. 2, *Decl. of Patrick A. Parenteau, Esq.* ¶ 1 (*Parenteau Decl.*). He says that he served as "the senior

supervising attorney in this matter from 2005 through 2008." *Id.* ¶ 2. Mr. Parenteau's bill starts on December 5, 2005 and stops on February 15, 2010. *Attorney Spreadsheet* at 2. He is billing at an hourly rate of $275.00. *First Clemmer Decl.* ¶ 9.

By sworn declaration dated April 16, 2010, Mr. Kolber says that he has been practicing administrative and environmental law for approximately four years. *Pl.'s Reply, Attach.* 3, *Decl. of Justin Kolber, Esq.* Attach. 3 ¶ 1 (*Kolber Decl.*). He states that he "served as a staff attorney and law fellow at the [ENRLC] from 2005 through mid-2007, and I have continued to serve as co-counsel in this matter during my present employment at Shalnsky & Co., LLP." *Id.* Mr. Kolber's billing begins on November 28, 2005 and continues through November 16, 2010. *Attorney Spreadsheet* at 2-4. He is billing at an hourly rate of $175.00. *First Clemmer Decl.* ¶ 10.

Mr. Rajotte has been practicing law "since December 2002, with some periods of inactivity while finishing my L.L.M. or teaching." *Pl.'s Reply*, Attach. 4, *Decl. of Benjamin Rojotte, Esq.* ¶ 1 (*Rajotte Decl.*). He says that he served "as a staff attorney and law fellow at the [ENRLC] in 2007-08, and I worked on the above-captioned matter during the latter half of 2007." *Id.* ¶ 2. Mr. Rajotte's billing begins on August 7, 2007 and ends on November 27, 2007. *Attorney Spreadsheet* at 2. He is billing at an hourly rate of $200.00. *First Clemmer Decl.* ¶ 11.

Ms. Clemmer has been practicing "administrative and environmental law for approximately ten years." *Pl.'s Reply*, Attach. 5, *Second Decl. of Teresa B. Clemmer,*

Esq. ¶ 1 (*Second Clemmer Decl.*).  She says she served "as the supervising attorney in this matter from February 2008 through the present."  *Id.*  Ms. Clemmer's billing begins on February 15, 2008 and continues through February 24, 2009.  *Attorney Spreadsheet* at 4-5.  She is billing at an hourly rate of $225.00.  *First Clemmer Decl.* ¶ 12.

When the dates are correlated, Mr. Mears and Mr. Parenteau seem to have played the role of senior partners throughout most of the litigation, Ms. Clemmer junior partner, and Mr. Kolber associate.  Mr. Rajotte appears to have entered only as special counsel for less than four months, and seems to have lent his expertise nearly exclusively to appellate work.[10]  Further, Mr. Parenteau's and Ms. Clemmer's roles were synchronized, so that Mr. Parenteau's last billing date and Ms. Clemmer's first was February 15, 2008; the five person legal team was actually four.

Thus, for the vast bulk of the litigation, three lawyers were involved for NN: Attorneys Mears, Parenteau/Clemmer, and Kolber.  Although the BIA claims that two lawyers should have been sufficient, the Court does not consider the difference to between three (and for four months four) and two to amount to overstaffing.[11]  *Compare Williams*, 1995 U.S. App. LEXIS 10667, at *17 (observing that

---

[10] It is not at all uncommon for different lawyers to work on the appellate portion of a case since different legal skills are often called for.  In fact, during the multiple appeals of this broader controversy, the BIA was represented by a different team of attorneys.

[11] The BIA overlooks the fact that at the oral argument on its motion for summary judgment, the Defendants were represented by four attorneys:  Assistant United States Attorney Evan Roth, Stephanie Yu of the Department of the Interior Office of the Solicitor, Sara Culley of the Natural Resources Section of the Department of Justice, Environmental Division, and John Harrington, Assistant Regional Solicitor from the southeast region in Atlanta.  *Tr. of Sept. 22, 2006 Proceeding* 4:1-7 (Docket # 37).

"[a]ppellants' arguments that the demands of this case were so great as to warrant extensive work by four partners, and occasional work by additional partners and associates, from three different law firms - - and that this strike force of lawyers always divided tasks efficiently - - apparently did not persuade the district court").

### 2. Duplicative Efforts

The Court identifies four areas of concern: 1) billing on the FOIA case attributable to the NEPA case; 2) multiple billing for a single event; 3) intra-clinic conferences; and 4) purely supervisory activities. As described elsewhere, NN's FOIA case is a companion action to an underlying dispute between NN and the BIA over the agency's approval of a lease between the Passamaquoddy Tribe and Quoddy, LLC, a private liquefied natural gas company. *See NN*, 672 F. Supp. 2d at 156-58. NN has filed its attorney fees request under the FOIA litigation only and it has not claimed that it is entitled to charge the BIA for its efforts in the underlying litigation, even though the two are somewhat intertwined. *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs*, 601 F. Supp. 2d 337, 339-41 (D. Me. 2009) (describing the impact the underlying litigation had not the FOIA claim). The Court has attempted to make certain that NN's charges on the FOIA litigation are reimbursable for that litigation under 5 U.S.C. § 522(a)(4)(E), and are not charges for the underlying litigation. *See Lipsett v Blanco*, 975 F.2d 934, 940-41 (1st Cir. 1992) (discussing billing for interrelated claims).

Second, the First Circuit has expressed concern about the law firm practice of sending multiple lawyers to an event when one would do. *Williams*, 1995 U.S. App.

LEXIS 10667, at *15 (assuming that "sending three lawyers to a deposition constitutes overstaffing"); *Lipsett*, 975 F.2d at 938 (stating that "the time for two or three lawyers in a courtroom or conference, when one would do, may obviously be discounted") (internal punctuation and citations omitted). Most of this FOIA litigation involved the preparation of written documents, motions, responses, replies; however, the parties twice appeared in court for oral argument on September 22, 2006 and on May 24, 2007.

As regards the third issue, the Court has scrutinized NN's bill whenever it reflects charges for intra-office conferences. In a law firm setting, it is not uncommon for lawyers to informally consult with each other to obtain the benefit of a second opinion; however, clients are reluctant to pay double or triple hourly rates for such consultations, and although such an internal conference may be billable, they require special justification. *Williams*, 1995 U.S. LEXIS 10667, at *19 (stating that when the court suspects duplicative billing "close scrutiny of resource deployment was necessary"). Otherwise, a law firm lunch could be transformed into a billing bonanza.

Finally, the Court has not approved the billing of purely supervisory time. From the Court's perspective, when a law school professor directs the activities of a student, the professor is teaching and the Court will not require the BIA to pay the professors at Vermont Law School to do what the Law School is paying them to do.

The Court scrutinized NN's bill to determine whether it claimed time for legal work on the companion litigation. Although some billing entries referred to

the companion litigation, with the understanding that the two cases were to some extent symbiotic, the Court has not reduced the NN bill for this reason.

Regarding multiple billing, on September 22, 2006, three lawyers appeared for NN and two addressed the Court; four lawyers appeared for the Defendants and two addressed the Court.[12]  The two NN lawyers who argued during the hearing were Mr. Kolber and Mr. Parenteau.  Although Mr. Kolber billed for attending oral argument, Mr. Parenteau did not.  *Attorney Spreadsheet* at 1, 3.  At the same time, Mr. Mears, who only attended, did bill.  *Id.* at 4.  Presumably, the reason Mr. Parenteau did not submit a bill for his attendance at the oral argument is that his portion of the argument involved the environmental claims, not the FOIA litigation. *Tr. of Sept. 22, 2006 Proceeding* at 17:3-6 (Attorney Kolber stating "[y]our Honor, as my colleague mentioned, Pat Parenteau will handle the environmental statutes"). NN has not attempted to justify Mr. Mears' mere presence at the oral argument, and as he did not participate at all, the Court will not allow him to bill the BIA for simply being there.[13]  The Court calculates that Mr. Mears billed .75 hours for attending the September 22, 2006 oral argument at $250 per hour or $187.50, and reduces his share of the NN bill by that amount.  The second oral argument took place on May 24, 2007.  Again, although only Mr. Kolber argued, Mr. Mears billed. The Court calculates that Mr. Mears billed 1.5 hours at $250 per hour or $375.00

---

[12] The Court has not included the introductions of visiting lawyers by local counsel for NN and the Defendants.  *Tr. of Sept. 22. 2006 Proceeding.*
[13] The Court does not hold that lawyers who do not argue can never bill, only that they must justify the billing.

for attendance at oral argument, and reduces his share of the NN bill by that additional amount.

Third, the Court reviewed the NN bill to determine whether its attorneys were double or triple billing for internal conferences. Although some attorneys have billed for consulting with another attorney, the Court did not identify any instances where the other attorney also billed for the consultation. The BIA has objected to what it describes as "duplicative 'Partner' oversight of Kolber's quality work," including Parenteau and Mears' review of Kolber's drafts. *BIA Resp.* at 6 n.4. The Court disagrees with the BIA that a lawyer should not bill for reviewing another lawyer's drafts. The only instance where the Court disallows senior attorney involvement is Mr. Mears' charges on November 6 and 8, 2006 for conferring with Mr. Kolber about a telephone conference with the Court:

> 11/06/2006 0.50 Confer with Justin re: upcoming conference with Judge $250.00 100% $125.00

> 11/08/2006 0.50 Confer with Justin re: conference with Judge $250.00 100% $125.00

The November 8, 2006 telephone conference with counsel was routine and did not, in the Court's view, justify Mr. Kolber's extensive consultation with Mr. Mears. The Court deducts 1.0 hour at $250.00 per hour from Mr. Mears' bill.

Regarding purely supervisory activities, the Court disallowed one item:

Attorney Rajotte:

> 11/27/07  0.50 Coordination with M. Klass, J. Sautter re research for and revision to brief @ 65% of $200 per hour = $65.[14]

---

[14] M. Klass presumably refers to Michael Klass, one of the students at the clinic. *Student Spreadsheet* at 4. The record does not reveal who "J. Sautter" may have been.

### 3. Excessive Time

In reviewing a legal bill under a fee-shifting statute, it is the Court's obligation to subtract "unproductive, excessive or otherwise unnecessary" time. *Lipsett*, 975 F.2d at 937 (quoting *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984). The Court has carefully reviewed the bill and has reduced the following:

1) <u>Kolber and Mears Charges for Reviewing the Answer</u>

NN's FOIA Complaint consisted of two claims in seven pages. *Compl.* (Docket # 1). The BIA and the Department of the Interior filed an Answer on March 14, 2006 consisting of three affirmative defenses, responding to the allegations in the Complaint, and totaling just over four pages. Mr. Kolber says he spent 1.5 hours reviewing the Answer and Mr. Mears did the same. *Attorney Spreadsheet* at 3, 4. Neither attorney could possibly read that slowly. The Court reduces Mr. Kolber's time for reviewing the Complaint to .2 and eliminates Mr. Mears' time as duplicative.

2) <u>Kolber Charge for Reviewing the Scheduling Order</u>

On April 6, 2006, the Court issued a standard scheduling order consisting of a total of just over two pages, and setting routine deadlines. *Scheduling Order* (Docket # 8). Mr. Kolber says he spent one full hour reviewing the order. *Attorney Spreadsheet* at 2. The Court is dubious. The Court reduces this claimed time to .2.

3) <u>Kolber and Clemmer Charges for NN's August 22, 2008 Supplemental Memorandum</u>

The First Circuit's Order of Court dated June 16, 2008 allowed NN 60 days to file a Rule 60(b) motion with the district court. *Order of Court* (Docket # 83). On August 23, 2008, NN filed a memorandum in support of the Rule 60(b) motion. The memorandum consisted of a total of 11 pages, one a signature page and another a certificate of service. The legal argument began on page 4 and ended with a conclusory paragraph on page 9, a total of just over four pages of substantive argument. Attorney Kolber charged 13 hours for drafting the supplemental memorandum. *Attorney Spreadsheet* at 4. Attorney Clemmer charged an additional 9 hours: 0.5 hours on August 19, 2008 for "Review research by J. McCave for 60b Supplemental Brief" and 2.1 hours the same day for "Draft/revise 60b Supplemental brief," 4.6 hours on August 20, 2008 for "Continue drafting 60b Supplemental brief," and 1.8 hours on August 21, 2008 for "Finalize 60b Supplemental brief." *Attorney Spreadsheet* at 5. The Court cannot conceive why these two experienced attorneys would require 22 hours to prepare such a short memorandum. The Court reduces these charges by 50%, allotting Attorney Kolber 6.5 hours and Attorney Clemmer 4.5 hours.

4) Kolber Charge for Reviewing the Court Order of October 3, 2006

On September 25, 2006, the Court issued a 15 page order, addressing the Defendants' motion for summary judgment. *Order on Defs.' Mot. for Summ. J.* (Docket # 29). During September 25-29, 2006, Mr. Kolber spent 32 hours reviewing the Order. *Attorney Spreadsheet* at 3. The Order contemplated that NN would move to supplement the Complaint in view of recent developments and on

September 29, 2006, NN did so. *Mot. to Amend Compl.* (Docket # 30); *First Am. Compl.* (Docket # 31). On October 3, 2006, the Court issued two orders: an order granting NN's motion to amend the complaint and a second order on the Defendants' motion for summary judgment. *Order on Pl.'s Mot. to Amend Comp.* (Docket # 33); *Second Order on Defs.' Mot. for Summ. J.* (Docket # 34). The first order consisted of a single substantive paragraph; the second order consisted of only three pages, and essentially granted the Defendants relief on the one part of the case that had been rendered moot. Mr. Kolber says he spent 4 hours reviewing the orders. The Court reduces this claimed time to a generous .4.

    5) <u>Mears and Kolber Charges for November 8, 2006 Telephone Conference</u>

On November 8, 2006, the Court held a telephone conference with counsel. The conference was precipitated by a November 2, 2006 Joint Proposed Briefing Schedule, which proposed dates by which the parties would file memoranda on proposed dispositive motions and raised a single additional question: whether the Court wished to review the withheld materials *in camera*. *Jt. Proposed Briefing Sch.* (Docket # 39). The Court gave notice of the telephone conference on November 6, 2006 and it was held on November 8, 2006. After Mr. Roth and Mr. Kolber entered their appearances, the Court confirmed that it preferred to perform an *in camera* review and that the parties did not object to its doing so, and that the proposed briefing schedule would stand. The entire conference took two minutes and was purely ministerial.

NN has submitted the following time for this telephone conference:

11/6/2006 David Mears 0.50 Confer with Justin re: upcoming conference with Judge $250.00 100% $125.00

11/6/2006 Justin Kolber 6.00 Telephone conference with Court and Defendants; Prep. for Conference (review Vaughn index and outline issues); Hold conference $175.00 100% $1,050.00

11/8/2006 David Mears 0.50 Confer with Justin re: telephone conference with Judge $250.00 100% 125.00

The total attorney time for preparation for, participation in, and debriefing on a two-minute telephone conference is 7 hours. Again, on their face, these charges are wholly unacceptable and excessive. The Court reduces Mr. Kolber's time from 6 hours to .5 hours and disallows Mr. Mears' time in its entirety.

6) <u>Kolber Charge for Reviewing the BIA Motion for Overlong Brief of November 16, 2006</u>

On November 16, 2006, the BIA filed a two-page motion for a one-day extension within which to file the Vaughn index and for permission to file a thirty-page brief, ten pages over the twenty-page limit. *Mot. for One-Day Extension and Over-Length Brief* (Docket # 44). Mr. Kolber says it took him one full hour to review this motion. *Attorney Spreadsheet* at 3. The Court reduces this claimed time to .1.

7) <u>Kolber Charge for Reviewing the BIA Motion for Overlong Brief of January 3, 2007</u>

On January 3, 2007, the BIA filed a two-page motion asking for permission to file a twenty-five page brief, five pages over the twenty-page limit. *Mot. for Over-*

*Length Brief* (Docket # 60). Mr. Kolber says he spent .5 hours reviewing the motion.[15] *Attorney Spreadsheet* at 3. The Court reduces this claimed time to .1.

8) <u>Parenteau Charge for Reviewing the December 11, 2009 Second Order</u>

On December 2, 2009, the Court issued a Second Order, granting in part and denying in part NN's April 24, 2009 request for relief. *Second Order on Pl.'s Req. for Relief* (Docket # 108). On February 15, 2010, Mr. Parenteau made the following billing entry:

> 2/15/2010 Pat Parenteau 1.00 Review Second Order (12/2/09) on Plaintiff's Request for Relief $275.00 50% $137.50

*Attorney Spreadsheet* at 2. The Court is mystified. Mr. Parenteau had not been involved in the FOIA litigation since November 26, 2007, when he reviewed and revised the First Circuit brief. Two and one-half months after the Court issued its Second Order, Mr. Parenteau read it. The Court can divine no reason why his late perusal of the Order should be charged to the BIA, and the Court disallows this charge.

### F.    "Detailed Contemporaneous" Billing Records

The First Circuit has suggested that a court may "discount or disallow" hours, where the "time is insufficiently documented" or the "time records [are] too generic, and, thus, insufficient as a practical matter to permit a court to answer questions about excessiveness, redundancy, and the like." *Torres-Rivera*, 524 F.3d at 336. An absence of contemporaneous records makes it difficult to perform its

---

[15] Included in Mr. Kolber's .5 hours is "Draft and File Plaintiff's Response of No Objection to Over-length Brief", but on January 4, 2007, the Court granted the BIA's January 3, 2007 motion for over-length brief. NN never filed a "no objection" response. The Court has disregarded time spent drafting and filing a pleading that was never filed.

"prerogative (indeed its duty) to winnow out excessive hours, time spent tilting at windmills, and the like." *Gay Officers Action League v. Puerto Rico* 247 F.3d 288, 296 (1st Cir. 2001). The First Circuit has warned that the failure of a party to produce "contemporaneous time records" may "have deleterious consequences (such as the slashing or disallowance of an award)." *Id.* at 297.

### 1. The Absence of Supporting Affidavits

The BIA suggests that NN's attorney fees application runs afoul of the First Circuit's documentation requirement in several respects. First, it points out that the supporting documentation for NN's original filing contained an affidavit from Attorney Clemmer describing how other attorneys had compiled their hours but no affidavits from those attorneys. *BIA Resp.* at 3. In its Reply, however, NN supplied affidavits from each of those attorneys describing the method by which they calculated the time they spent on the case. *NN Reply*, *Mears Decl.*; *Parenteau Decl.*; *Kolber Decl.*; *Rajotte Decl.*; *Second Clemmer Decl.* Reviewing the submitted affidavits, the Court concludes that NN has overcome BIA's first objection.

### 2. Combination of Contemporaneous and Reconstructive Billing

BIA's second objection is that the attorneys used a combination of contemporaneous recordings and post-event reconstructions instead of purely contemporaneous record-keeping, and for the reconstructed billing, NN failed to offer "an individualized explanation of how fees were reconstructed after the fact based on a combination of contemporaneous and other records." *BIA Resp.* at 3. NN's reply attached sworn declarations by the attorneys that reflect slight

variations in timekeeping. Attorney Mears kept his time "on paper timesheets that I maintain for each case on which I work. I usually make these recordings on a daily basis, or at most a weekly basis." *Mears Decl.* ¶ 3. Attorney Parenteau kept track of most of his time by handwritten notes "made on the same day or within a week of the work performed." *Parenteau Decl.* ¶ 3. Attorney Kolber "kept track of my hours through a combination of contemporaneous calendar entries and contemporaneous scheduling notes." *Kolber Decl.* ¶ 3. He "supplemented and confirmed these records by carefully reviewing and referring to docket entries, the contemporaneously generated time- and date-stamps on documents and emails, and other reliable records." *Id.* ¶ 3. Attorney Rajotte "documented my time conservatively based on contemporaneously generated time- and date-stamps on emails, as well as indices of pleadings." *Rajotte Dec.* ¶ 3. He attested that "the spreadsheet in Exhibit 3 includes an accurate and reasonable summary of my hours." *Id.* Attorney Clemmer "kept track of my hours primarily by entering them directly into an electronic database on the same day as, or within a few days of, when the work was performed." *See Second Clemmer Decl.* ¶ 3. Attorneys Parenteau and Clemmer admit that in a few instances, they carefully reconstructed hours by referring to calendar entries and electronic time- and date-stamps on emails and document profiles. *Id.*; *Parenteau Decl.* ¶ 3.

Contemporaneous recording is not merely consistent with standard law firm practice; it is generally required by the First Circuit. In *Grendel's Den, Inc. v. Larkin*, the First Circuit was critical of an attorney's fee award based on

retrospective calculations "when no contemporaneous time records exist." 749 F.2d at 951. The *Grendel* Court observed that some courts require "contemporaneous time records," and it joined those courts:

> We now take the same step and serve notice that henceforth, in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance.

*Id.* at 952. Here, it seems that the vast amount of claimed time was based on contemporaneous records; however, some portion for some of the attorneys was retrospectively generated.

It is correct that as the First Circuit wrote in *Gay Officers*, if the BIA "doubted whether the compilations faithfully tracked the time sheets, it could have filed a discovery request for the original records." *Gay Officers*, 247 F.3d at 297. If the BIA had done so, the Court could have evaluated how much time was contemporaneous and how much retrospective. The Court is not critical of the BIA, however, for failing to engage in discovery. To say this case has been thoroughly litigated is to understate, and in its memorandum, NN threatened to seek fees for seeking fees. *Pl.'s Pet.* at 8 n.5 (citing *Comm'r, Immigration and Naturalization Serv. v. Jean*, 496 U.S. 154, 163 n.10 (1990)). Further, the Court previously ruled that it was going to order an attorney's fee pursuant to § 552(a)(4)(E), and the BIA was reaching the point of diminishing returns. On this issue, the best resolution is for the Court to take into account as one of many factors that a small portion of the requested attorney fees have not been properly documented in accordance with

First Circuit case law. Although an award of attorney fees is necessarily reduced to a mathematical computation, the Court retains significant discretion in arriving at the figure, and here the Court has considered NN's documentation of attorney fees, along with other factors, in arriving at its award.

### 3. Differences Between Student and Attorney Record Keeping

The BIA's third objection is that NN's attorneys "followed an approach that required contemporaneous weekly timesheets to be submitted by students, but not by attorneys, without any explanation for the difference." *BIA Resp.* at 3. NN has answered this concern by the declarations in its Reply; except for rare instances, the attorneys kept contemporaneous records.

### 4. Insufficient Detail

The BIA's fourth objection is that the billing records fail to meet the First Circuit's requirement that the time entries contain sufficient detail to allow evaluation. *Id.* at 4. In *Tennessee Gas Pipeline Co. v. 104 Acres of Land*, the First Circuit explained that "[i]n order for litigants to receive fee awards, this court has required that they submit 'a full and specific accounting of the tasks performed, the dates of performance, and the number of hours spent on each task.'" 32 F.3d 632, 634 (1st Cir. 2004) (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 526 (1st Cir. 1991)). The *Tennessee Gas* Court noted:

> The district court found that the Simons' time sheets were not sufficiently detailed to enable the court to determine whether the fees were excessive or duplicative. The district court stated that "the time summaries are replete with time charges for such matters as 'Confer with co-counsel,' 'Confer with client,' 'Review materials,' Review

documents,' and 'Legal Research' without any indication of the subject matter involved. The district court explained that in addition to making it impossible for the court to gage whether the task performed was warranted, the failure to include some description of the subject matter of the task made it impossible to determine if the time factor allocated was appropriate or excessive.

*Id.* In *Torres-Rivera*, the First Circuit observed that if the time records are "too generic," the lack of specificity can as a practical matter make it too difficult "to permit a court to answer questions about excessiveness, redundancy, and the like. In that event, the court may either discount of disallow those hours." 524 F.3d at 336.

The BIA has a point here. None of the attorneys kept billing records that strictly meet the *Tennessee Gas* and *Torres-Rivera* standard. Some examples from each attorney will suffice. On August 10, 2006, Mr. Parenteau charged 1.50 hours at $275 per hour for a total of $412.50 for "Review, revise and discuss sur-reply memo with co-counsel." *Attorney Spreadsheet* at 2. Mr. Kolber's itemization reveals that he had spent 27 hours between July 31, 2006 and August 11, 2006 on the sur-reply and Mr. Mears' itemization reveals he spent 2 hours on August 9, 2006 reviewing and commenting on the draft sur-reply. *Id.* at 3, 4. What precisely did Mr. Parenteau's involvement add to the sur-reply? How much time did he spend reviewing the draft sur-reply? Revising the sur-reply? Discussing the sur-reply? With whom did he discuss the sur-reply? On what issue was his expertise used or was he performing a general review? As the sur-reply was filed in final form on August 10, 2006, Mr. Parenteau must have been reviewing a product that was nearly finished. How on this information does the Court "gage whether the task

performed was warranted . . . [or] . . . determine if the time factor allocated was appropriate or excessive"?  *Tennessee Gas*, 32 F.3d at 634.

On November 24, 2007, Mr. Rajotte charged 2 hours for "research case law for brief; Review of same by M. Klass" at an hourly rate of $200, resulting in a total charge of $400, which he reduced to 65% for a net charge of $260.  What was the focus of his research?  At that point, NN was appealing the Court's June 22, 2007 Order denying its motion for summary judgment.  Was Mr. Rajotte spinning his wheels attempting to controvert the Court's ruling prohibiting the revelation of the government employees' email addresses?  Or was he devoting himself to the scope of the deliberative process privilege?  Mr. Rajotte's billing notations are similar to "'Legal Research' without any indication of the subject matter involved" that the First Circuit warned against in *Tennessee Gas*, 32 F.3d at 634.

Mr. Kolber, who billed $92,610 by far the most of any attorney, has the most indecipherable billing records.  Oddly, Mr. Kolber does not specify the day on which he completed a particular task, but gives a span of time – usually three or four days – within which he performed the work.  Then, he mixes types of activities together.  For example, between October 2, 2006 and October 6, 2006, Mr. Kolber says he spent 4 hours in the following tasks: "Review Court Order Granting Plaintiff's Motion to Amend Complaint and Court's Second Order on Defendant's Motion for SJ."  *Attorney Spreadsheet* at 3.  The question, however, is how much time did Mr. Kolber spend reviewing the order granting the motion to amend and how much time reviewing the second order on BIA's motion for summary judgment?  Without the

itemization contemplated by *Tennessee Gas*, the Court is left to speculate about reasonableness.

Mr. Mears' itemization suffers from the same lack of specificity. Despite the First Circuit's clear warning against listing only "Review documents" or "Legal research", typical entries include: "Review U.S. SJ motion; confer with Pat and Justin" – 2.00; "Review and comment on draft sur-reply" – 2.00; "Review and comment on First Circuit brief" – 2.5 hours. *Attorney Spreadsheet* at 4.

To her credit Ms. Clemmer's entries contain a degree of greater specificity, but her general pattern follows the billing practices of the other attorneys. As the example from the filing of NN's August 22, 2008 supplemental memorandum demonstrates, when isolated to a specific task, Attorney Clemmer's hours do not withstand scrutiny. It is possible that Attorney Clemmer could justify her stated expenditure of time, but her notations are simply not sufficiently task specific to allow for meaningful judicial review.

Finally, all the attorneys have periodically reduced their charges by varying percentages without a specific explanation as to what prompted their decisions. Attorney Clemmer generally explained that the lawyers excluded hours on matters upon which NN did not prevail and that they had "exercised our billing judgment to exclude a large number of other hours to ensure that the time claimed is not excessive, redundant, or otherwise unnecessary. For instance, we are not seeking any reimbursement for (1) paralegal time, (2) local counsel time, (3) time spent by seven student clinicians, (4) travel time, (5) time spent on settlement discussions, or

(6) time spent on the preparation of this fee petition." *First Clemmer Decl.* ¶ 4. Although the application of one or more of these reasons for reduction or elimination is occasionally apparent on the face of the bill, the Court is more often left to guess which reason applies. Further, there is no individual explanation for the percentage of reduction. As a consequence, NN's counsel's "billing judgment" is not sufficiently detailed to allow the Court to fully meet its obligation to make an independent judgment.

The Court highlights two overriding points. The Court previously determined that NN's counsel are entitled to attorney fees under 5 U.S.C. § 5 U.S.C. § 522(a)(4)(E). *Second Order on Pl.'s Req. for Relief* (Docket # 108). The ENRLC has performed a public service by filing and pressing the FOIA request despite what, viewed charitably to the BIA, was an ineffective, disorganized, and occasionally misleading series of agency responses. The ENRLC's persistence and its revelation of BIA disorganization should cause the BIA to reassess its procedure for responding to FOIA requests, so that it handles future inquiries more systematically and successfully. Further, much of the ENRLC legal work about which the BIA is now complaining was necessitated by the BIA's own chaotic and occasionally contradictory actions. The Court is convinced that the ENRLC did a significant amount of legal work, that it "substantially prevailed," and that it is entitled to a significant fee under § 522(a)(4)(E).

The second concern, however, is that by its own inadequate recordkeeping, ENRLC has made it difficult for the Court to rule in its favor. The generic nature of

the descriptions of legal services, the lists of multiple services under one billing entry, the evidence of overstaffing, the lack of explanation for reduced or non-billed work, all obstruct a reasoned evaluation, and as the First Circuit has often written, the burden rests on the proponent to demonstrate its entitlement to the fee. *San Juan Dupont Plaza Hotel Fire Litg. Pasquale Massaro v. Chesley*, 111 F.3d 220, 228 (1st Cir. 1997) (stating that the fee proponent "undoubtedly must establish their entitlement to reimbursement"). Most disturbing is the fact that the time charges for tasks serendipitously isolated are either blatantly excessive, such as Mr. Mears' and Mr. Kolber's claim that it took them each 1.5 hours to review the first Answer, and 7 hours to prepare for, attend and debrief a 2 minute ministerial telephone conference with the Court; Mr. Kolber's claim that it took him 1 hour to review a two-page Scheduling Order and 1 hour to review a two-page motion for extension of time; and Mr. Kolber's and Ms. Clemmer's claim that they spent 22 hours preparing a nine-page memorandum with just over four pages of substantive argument.

Under First Circuit law, a "failure to document time might merit disallowal, or at least drastic reduction, of a fee award." *Grendel's Den*, 749 F.2d at 952 (internal punctuation omitted). The First Circuit has repeatedly made it clear that "the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Grendel's Den*, 749 F.2d at 952. The *Grendel* Court announced this "new, less forgiving standard" on December 5, 1984, so this higher

standard has been part of the fabric of First Circuit law for over twenty-five years. *Lipsett*, 975 F.2d at 938.

The First Circuit explained that "[w]here [the prevailing] party furnishes time records that are ill-suited for evaluative purposes, the court is hampered in ascertaining whether those hours were excessive, redundant, or spent on irrelevant issues. In such a circumstance, the court may adjust those entries to achieve an equitable result." *Torres-Rivera*, 524 F.3d at 340 (internal citation omitted).  In keeping with *Torres-Rivera*, rather than disallowing the attorney fees claim in its entirety, the Court applies an equitable 25% reduction to its net figure; this final deduction responds to ENRLC's notable lack of proper documentation but still awards ENRLC for the legal work that it performed on behalf of NN.

## III.    CONCLUSION

The Court GRANTS Plaintiff's Petition for Attorney Fees and Costs Under the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E), and awards the Plaintiff attorney fees in the total amount of $86,885.16 (Docket # 116)

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of July, 2010